# PROMISSORY NOTE

US $9,637,500.00 December 2, 2020

**FOR VALUE RECEIVED**, **Alvarez Investement Group LLC, a Georgia Limited Liability Company** ("**Borrower**") promises to pay to the order of NuBridge Commercial Lending LLC, a Delaware limited liability company ("**Lender**"), the principal amount of **nine million six hundred thirty-seven thousand five hundred and 00/100** Dollars (**US $9,637,500.00**) or so much thereof as shall be advanced by Lender pursuant to the terms set forth in the Loan Agreement (as defined below), (the "**Mortgage Loan**"), together with interest thereon accruing at the Interest Rate on the unpaid principal balance from the date the Advance proceeds are disbursed until fully paid in accordance with the terms hereof and of that certain Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

1. **Defined Terms.**

Capitalized terms used and not specifically defined in this Promissory Note (this "**Note**") have the meanings given to such terms in the Loan Agreement.

2. **Repayment; Loan Terms; Balloon Payment.**

Interest on all outstanding Advances shall accrue from the date such Advance is made until the date the Principal Amount is repaid in full as described below. Interest on all outstanding Advances shall be paid by Borrower on a monthly basis in arrears, on the first day of each month (each an "**Interest Payment Date**") commencing the month following the month in which the first Advance is funded, and shall accrue at a rate per annum equal to **9.99%** (the "**Interest Rate**") and shall be computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months.

Borrower shall pay to Lender the aggregate amount of all Advances funded (the "**Principal Amount**") plus all accrued interest and any and all other amounts due and unpaid hereunder upon the earliest to occur of (i) **December 1, 2021** (the "**Maturity Date**"), (ii) such date as Lender shall determine, in its sole discretion and in good faith, that there has been a material adverse change in the operations, business, properties or condition, financial or otherwise of Borrower or any Guarantor, (iii) acceleration upon the occurrence of an event of default or otherwise pursuant to Section 7 hereof and (iv) such date as Borrower elects to prepay in full the Principal Amount plus the accrued but unpaid interest hereon.

Borrower agrees to pay the Principal Amount of the Mortgage Loan and interest on the Principal Amount of the Mortgage Loan from time to time outstanding at the Interest Rate or such other rate or rates and at the times specified in the Loan Agreement, together with all other amounts due to Lender under the Loan Documents. The amount and date of each Advance made shall be indicated on the Schedule of Advances attached hereto, provided, that the failure of the Lender to make any such recordation or notation shall not affect the obligations of the Borrower to make a payment when due of any amount owing hereunder in respect of any Advance.

Note - Bridge Loan # ███████ Page 1 of 5

# EXHIBIT A

The Lender is under no obligation to refinance the Mortgage Loan at that time. You will therefore be required to make payment out of other assets you may own, or will have to find a lender willing to lend you the money at prevailing market rates, which may be considerably higher or lower than the interest rate on this Mortgage Loan. If you refinance this Mortgage Loan at maturity, you may have to pay some or all closing costs normally associated with a new loan, even if you obtain refinancing from the same lender.

**3.    Security.**

The Mortgage Loan evidenced by this Note, together with all other Indebtedness is secured by, among other things, the Security Instrument, the Loan Agreement and the other Loan Documents.  All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

**4.    Acceleration.**

In accordance with the Loan Agreement, if an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any accrued and unpaid interest, including interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other amounts payable under this Note, the Loan Agreement and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower, unless applicable law requires otherwise (and in such case, after satisfactory notice has been given).

**5.    Personal Liability.**

The provisions of Section 8 (Personal Liability) of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

**6.    Governing Law.**

This Note shall be governed in accordance with the terms and provisions of Section 10(a) of the Loan Agreement.

**7.    Waivers.**

Presentment, demand for payment, notice of nonpayment and dishonor, protest and notice of protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace and diligence in collecting the Indebtedness are waived by Borrower, for and on behalf of itself, Guarantor and Key Principal, and all endorsers and guarantors of this Note and all other third party obligors or others who may become liable for the payment of all or any part of the Indebtedness.

EXHIBIT A

**8.    Commercial Purpose.**

Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise or activity, and not for agricultural, personal, family or household purposes.

**9.    Joint and Several (or Solidary, as applicable) Liability.**

(a)    If more than one Person executes this Note as Borrower, the obligations of such Person shall be joint and several (solidary instead for purposes of Louisiana law).

**10.    Notices.**

All Notices required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 10(e) of the Loan Agreement.

**11.    Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

**12.    Loan Charges Savings Clause.**

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any prepayment premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the



EXHIBIT A

Loan Documents. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

13.     **WAIVER OF TRIAL BY JURY.**

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

14.     **Receipt of Loan Documents**.

Borrower acknowledges receipt of a copy of each of the Loan Documents.

15.     **Incorporation of Schedules**.

The schedules, if any, attached to this Note are incorporated fully into this Note by this reference and each constitutes a substantive part of this Note.

**ATTACHED SCHEDULE.** The following Schedule is attached to this Note:

☐                    Schedule 1          Modifications to Note

**[Remainder of Page Intentionally Blank]**

Note - Bridge Loan # ███                              Page 4 of 5

EXHIBIT A



**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER**:
Alvarez Investement Group LLC

By: _____

Name: Joanna A. Burnley

Title: CEO & Sole Member

EXHIBIT A

## GUARANTY
### (Payment)

This GUARANTY (Payment) (this "**Guaranty**"), dated as of **December 2, 2020**, is executed by the undersigned ("**Guarantor**"), to and for the benefit of NuBridge Commercial Lending LLC ("**Lender**").

## RECITALS:

A.      Pursuant to that certain Loan and Security Agreement dated as of the date hereof, by and between **Alvarez Investement Group LLC, a Georgia Limited Liability Company** ("**Borrower**") and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), Lender is making a loan to Borrower in the original principal amount of **nine million six hundred thirty-seven thousand five hundred and 00/100 Dollars ($9,637,500.00)** (the "**Mortgage Loan**"), as evidenced by that certain Promissory Note dated as of the date hereof, executed by Borrower and made payable to the order of Lender in the amount of the Mortgage Loan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**").

B.      The Note will be secured by, among other things, a Security Instrument (as defined in the Loan Agreement) encumbering the real property described in the Security Instrument (the "**Property**").

C.      Guarantor has an economic interest in Borrower or will otherwise obtain a material financial benefit from the Mortgage Loan.

D.      As a condition to making the Mortgage Loan to Borrower, Lender requires that Guarantor execute this Guaranty.

NOW, THEREFORE, in order to induce Lender to make the Mortgage Loan to Borrower, and in consideration thereof, Guarantor agrees as follows:

## AGREEMENTS:

**1.      Recitals.**

The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Guaranty.

**2.      Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.

Guaranty (Payment)                                                              Page 1 of 12
Alvarez Investement Group LLC                                    Loan No. █████



EXHIBIT A

3.    **Guaranteed Obligations.**

Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment and performance when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of:

(a)    the entire Indebtedness;

(b)    all amounts, obligations and liabilities owed to Lender under Article 3 (Personal Liability) of the Loan Agreement (including the payment and performance of all indemnity obligations of Borrower described in Section 3.03 (Personal Liability for Indemnity Obligations) of the Loan Agreement and including all of Borrower's obligations under the Environmental Indemnity Agreement); and

(c)    all costs and expenses, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

4.    **Survival of Guaranteed Obligations.**

The obligations of Guarantor under this Guaranty shall survive any Foreclosure Event, and any recorded release or reconveyance of the Security Instrument or any release of any other security for any of the Indebtedness.

5.    **Guaranty of Payment; Community Property.**

Guarantor's obligations under this Guaranty constitute a present and unconditional guaranty of payment and not merely a guaranty of collection. If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or Guarantor's spouse is a community property jurisdiction, Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all Guarantor's separate property and Guarantor's interest in any community property.

6.    **Obligations Unsecured; Cross-Default.**

The obligations of Guarantor under this Guaranty shall not be secured by the Security Instrument or the Loan Agreement. However, a default under this Guaranty shall be an Event of Default under the Loan Agreement, and a default under this Guaranty shall entitle Lender to be able to exercise all of its rights and remedies under the Loan Agreement and other Loan Documents.

7.    **Continuing Guaranty.**

The obligations of Guarantor under this Guaranty shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any provision of this Guaranty, the Note, the Loan Agreement, the Security Instrument or any other Loan Document. Guarantor agrees that performance of the obligations hereunder shall be a primary obligation, shall not be subject to any



EXHIBIT A

counterclaim, set-off, recoupment, abatement, deferment or defense based upon any claim that Guarantor may have against Lender, Borrower, any other guarantor of the obligations hereunder or any other person or entity, and shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by any circumstance or condition (whether or not Guarantor shall have any knowledge thereof), including:

(a)     any furnishing, exchange, substitution or release of any collateral securing repayment of the Mortgage Loan, or any failure to perfect any lien in such collateral;

(b)     any failure, omission or delay on the part of Borrower, Guarantor, any other guarantor of the obligations hereunder or Lender to conform or comply with any term of any of the Loan Documents or failure of Lender to give notice of any Event of Default;

(c)     any action or inaction by Lender under or in respect of any of the Loan Documents, any failure, lack of diligence, omission or delay on the part of Lender to perfect, enforce, assert or exercise any lien, security interest, right, power or remedy conferred upon it in any of the Loan Documents, or any other action or inaction on the part of Lender;

(d)     any Bankruptcy Event, or any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshaling of assets and liabilities or similar events or proceedings with respect to Guarantor or any other guarantor of the obligations hereunder, or any of their respective property or creditors or any action taken by any trustee or receiver or by any court in such proceeding;

(e)     any merger or consolidation of Borrower into or with any entity or any sale, lease or Transfer of any asset of Borrower, Guarantor or any other guarantor of the obligations hereunder to any other Person;

(f)     any change in the ownership of Borrower or any change in the relationship between Borrower, Guarantor or any other guarantor of the obligations hereunder, or any termination of such relationship;

(g)     any release or discharge by operation of law of Borrower, Guarantor or any other guarantor of the obligations hereunder, or any obligation or agreement contained in any of the Loan Documents; or

(h)     any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing, and whether seen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against Borrower or Guarantor to the fullest extent permitted by law.



EXHIBIT A

**8.    Guarantor Waivers.**

Guarantor hereby waives:

(a)    the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty (and agrees that Guarantor's obligations shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or a guarantor);

(b)    the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors;

(c)    diligence in collecting the Indebtedness, presentment, demand for payment, protest and all notices with respect to the Loan Documents and this Guaranty which may be required by statute, rule of law or otherwise to preserve Lender's rights against Guarantor under this Guaranty, including notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any Event of Default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest and notice of the incurring by Borrower of any obligation or indebtedness; and

(d)    all rights to require Lender to:

(1)    proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness;

(2)    proceed against or pursue any remedy it may now or hereafter have against Borrower or any guarantor, or, if Borrower or any guarantor is a partnership, any general partner of Borrower or general partner of any guarantor; or

(3)    demand or require collateral security from Borrower, any other guarantor or any other Person as provided by applicable law or otherwise.

(e)    In addition, Guarantor waives the benefit of O.C.G.A. Section 10-7-24.

**9.    No Effect Upon Obligations.**

At any time or from time to time and any number of times, without notice to Guarantor and without releasing, discharging or affecting the liability of Guarantor:

(a)    the time for payment of the principal of or interest on the Indebtedness may be extended or the Indebtedness may be renewed in whole or in part;

(b)    the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

EXHIBIT A



(c)    the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(d)    the maturity of the Indebtedness may be accelerated as provided in the Loan Documents;

(e)    any or all payments due under the Loan Agreement or any other Loan Document may be reduced;

(f)    any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(g)    any amounts under the Loan Agreement or any other Loan Document may be released;

(h)    any security for the Indebtedness may be modified, exchanged, released, surrendered or otherwise dealt with or additional security may be pledged or mortgaged for the Indebtedness;

(i)    the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(j)    any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; and

(k)    any other terms of the Loan Documents may be modified as required by Lender.

**10.    Joint and Several (or Solidary) Liability.**

If more than one Person executes this Guaranty as Guarantor, such Persons shall be liable for the obligations hereunder on a joint and several (solidary instead for purposes of Louisiana law) basis. Lender, in its discretion, may:

(a)    to the extent permitted by applicable law, bring suit against Guarantor, or any one or more of the Persons constituting Guarantor, and any other guarantor, jointly and severally (solidarily instead for purposes of Louisiana law), or against any one or more of them;

(b)    compromise or settle with any one or more of the Persons constituting Guarantor, or any other guarantor, for such consideration as Lender may deem proper;

(c)    discharge or release one or more of the Persons constituting Guarantor, or any other guarantor, from liability or agree not to sue such Person; and

**Guaranty (Payment)**
**Alvarez Investement Group LLC**

**Page 5 of 12**
**Loan No.** ▮▮▮▮

EXHIBIT A

(d)      otherwise deal with Guarantor and any guarantor, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guaranty.

Nothing contained in this Section 10 shall in any way affect or impair the rights or obligations of Guarantor with respect to any other guarantor.

**11.    Subordination of Affiliated Debt.**

Any indebtedness of Borrower held by Guarantor now or in the future is and shall be subordinated to the Indebtedness and any such indebtedness of Borrower shall be collected, enforced and received by Guarantor, as trustee for Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

**12.    Subrogation.**

Guarantor shall have no right of, and hereby waives any claim for, subrogation or reimbursement against Borrower or any general partner of Borrower by reason of any payment by Guarantor under this Guaranty, whether such right or claim arises at law or in equity or under any contract or statute, until the Indebtedness has been paid in full and there has expired the maximum possible period thereafter during which any payment made by Borrower to Lender with respect to the Indebtedness could be deemed a preference under the Insolvency Laws.

**13.    Voidable Transfer.**

If any payment by Borrower is held to constitute a preference under any Insolvency Laws or similar laws, or if for any other reason Lender is required to refund any sums to Borrower, such refund shall not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Lender and Guarantor that Guarantor's obligations under this Guaranty shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. If any payment by any Guarantor should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the obligations guaranteed hereunder shall automatically be revived, reinstated and restored by the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses and legal fees incurred by Lender in connection therewith, and shall exist as though such Voidable Transfer had never been made, and any other guarantor, if any, shall remain liable for such obligations in full.

**14.    Credit Report/Credit Score.**

Guarantor acknowledges and agrees that Lender is authorized, no more frequently than once in any twelve (12) month period, to obtain a credit report (if applicable) on Guarantor, the

EXHIBIT A



cost of which shall be paid for by Guarantor. Guarantor acknowledges and agrees that Lender is authorized to obtain a Credit Score (if applicable) for Guarantor at any time at Lender's expense.

**15.    Financial Reporting.**

Guarantor shall deliver to Lender such Guarantor financial statements as required by Section 8.02 (Books and Records; Financial Reporting – Covenants) of the Loan Agreement.

**16.    Further Assurances.**

Guarantor acknowledges that Lender (including its successors and assigns) may sell or transfer the Mortgage Loan, or any interest in the Mortgage Loan.

(a)    Guarantor shall, subject to Section 16(b) below:

(1)    do anything necessary to comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's and Guarantor's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A)    Lender to sell the Mortgage Loan to such Investor;

(B)    Lender to obtain a refund of any commitment fee from any such Investor; or

(C)    any such Investor to further sell or securitize the Mortgage Loan;

(2)    confirm that Guarantor is not in default under this Guaranty or in observing any of the covenants or agreements contained in this Guaranty (or, if Guarantor is in default, describing such default in reasonable detail); and

(3)    execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions or additions to this Guaranty as is reasonably required by Lender or such Investor.

(b)    Nothing in this Section 16 shall require Guarantor to do any further act that has the effect of:

(1)    changing the essential economic terms of the Mortgage Loan set forth in the related commitment letter between Borrower and Lender;

(2)    imposing on Borrower or Guarantor greater personal liability under the Loan Documents than that set forth in the related commitment letter between Borrower and Lender; or

**Guaranty (Payment)**
**Alvarez Investement Group LLC**



EXHIBIT A

(3)    materially changing the rights and obligations of Borrower or Guarantor under the commitment letter.

## 17.    Successors and Assigns.

Lender may assign its rights under this Guaranty in whole or in part and, upon any such assignment, all the terms and provisions of this Guaranty shall inure to the benefit of such assignee to the extent so assigned. Guarantor may not assign its rights, duties and obligations under this Guaranty, in whole or in part, without Lender's prior written consent and any such assignment shall be deemed void ab initio. The terms used to designate any of the parties herein shall be deemed to include the heirs, legal representatives, successors and assigns of such parties.

## 18.    Final Agreement.

Guarantor acknowledges receipt of a copy of each of the Loan Documents and this Guaranty. THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Guaranty. Neither this Guaranty nor any of its provisions may be waived, modified, amended, discharged or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in that agreement.

## 19.    Governing Law.

This Guaranty shall be governed by and construed in accordance with the substantive law of the Property Jurisdiction without regard to the application of choice of law principles that would result in the application of the laws of another jurisdiction.

## 20.    Property Jurisdiction.

Guarantor agrees that any controversy arising under or in relation to this Guaranty shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Guaranty or any other Loan Document with respect to the subject matter hereof. Guarantor irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 21.    Time is of the Essence.

Guarantor agrees that, with respect to each and every obligation and covenant contained in this Guaranty, time is of the essence.



EXHIBIT A

22.     **No Reliance.**

Guarantor acknowledges, represents and warrants that:

(a)     it understands the nature and structure of the transactions contemplated by this Guaranty and the other Loan Documents;

(b)     it is familiar with the provisions of all of the documents and instruments relating to such transactions;

(c)     it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property or of the assets of Guarantor;

(d)     it has had the opportunity to consult counsel; and

(e)     it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Guaranty or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into or otherwise in connection with this Guaranty, any other Loan Document or any of the matters contemplated hereby or thereby.

23.     **Notices.**

Guarantor agrees to notify Lender of any change in Guarantor's address within ten (10) Business Days after such change of address occurs.  All notices under this Guaranty shall be:

(a)     in writing and shall be

(1)     delivered, in person;

(2)     mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(3)     sent by overnight courier; or

(4)     sent by electronic mail with originals to follow by overnight courier;

(b)     addressed to the intended recipient at the notice addresses provided under the signature block at the end of this Guaranty; and

(c)     deemed given on the earlier to occur of:

(1)     the date when the notice is received by the addressee; or

(2)     if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.



# EXHIBIT A

24.   **Construction.**

(a)   Any reference in this Guaranty to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Guaranty or to a Section or Article of this Guaranty.

(b)   Any reference in this Guaranty to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(c)   Use of the singular in this Guaranty includes the plural and use of the plural includes the singular.

(d)   As used in this Guaranty, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(e)   Whenever Guarantor's knowledge is implicated in this Guaranty or the phrase "to Guarantor's knowledge" or a similar phrase is used in this Guaranty, Guarantor's knowledge or such phrase(s) shall be interpreted to mean to the best of Guarantor's knowledge after reasonable and diligent inquiry and investigation.

(f)   Unless otherwise provided in this Guaranty, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(g)   All references in this Guaranty to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(h)   "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

25.   **WAIVER OF JURY TRIAL.**

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF GUARANTOR AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS GUARANTY OR ANY LOAN DOCUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY GUARANTOR AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

EXHIBIT A



26.    **Schedules.**

The schedules, if any, attached to this Guaranty are incorporated fully into this Guaranty by this reference and each constitutes a substantive part of this Guaranty.

**ATTACHED SCHEDULE.**  The following Schedule is attached to this Guaranty:

**None**

**[Remainder of Page Intentionally Blank]**

EXHIBIT A



**IN WITNESS WHEREOF**, Guarantor has signed and delivered this Guaranty under seal (where applicable) or has caused this Guaranty to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, Guarantor intends that this Guaranty shall be deemed to be signed and delivered as a sealed instrument.

**GUARANTOR**:

Joanna A. Burnley

Address for Notices:

640 Pine Ridge Trl SE

Conyers, GA 30094

**Guaranty (Payment)**
**Alvarez Investement Group LLC**

Page 12 of 12
Loan No. ▮▮▮▮



EXHIBIT A

# LOAN AND SECURITY AGREEMENT

## (BRIDGE)

This LOAN AND SECURITY AGREEMENT (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**") is made as of **December 2, 2020** (the "**Effective Date**") by and between **Alvarez Investement Group LLC, a Georgia Limited Liability Company** ("**Borrower**"), and NuBridge Commercial Lending LLC, a Delaware limited liability company ("**Lender**").

Borrower has requested that Lender provide financing to Borrower to be secured by the Mortgaged Property (as hereinafter defined). To induce Lender to make available this non-revolving credit facility to Borrower and advance funds Borrower agrees with Lender as follows:

**Section 1.        Defined Terms; Schedules Exhibits, and Attachments**

(a)        Capitalized terms not otherwise defined in the body of this Loan Agreement shall have the meanings set forth in the Definitions Schedule attached as Schedule 1 to this Loan Agreement.

(b)        The schedules, exhibits, and any other addenda or attachments are incorporated fully into this Loan Agreement by this reference and each constitutes a substantive part of this Loan Agreement.

**Section 2.        Advance Requests and Advance Categories.**

(a)        Borrower has requested that Lender fund a mortgage loan in the amount of the Initial Advance. Subject to the terms and conditions of this Loan Agreement and the other Loan Documents, Lender hereby makes the Initial Advance to Borrower, and Borrower hereby accepts the Initial Advance from Lender. The Initial Advance will be used in whole or in part to payoff existing debt secured by the Mortgaged Property.

(b)        Borrower may request Lender to fund Additional Advances pursuant to a Request for Advance in the form attached hereto as Exhibit A, executed and delivered by Borrower and otherwise satisfactory to Lender, describing the amount and date of the Advance and identifying the Advance Category to which such Advance shall be applied. Borrower shall be permitted to submit no more than Maximum Request Number for an Advance Category, the Advances for each Advance Category shall not exceed, in the aggregate, the related Maximum Advance Category Amount and the aggregate of all Advances made under this Loan Agreement shall not exceed the Maximum Loan Amount. Unless otherwise agreed to in writing by Lender the final Advance shall occur on or before Advance Termination Date. All Requests for Advances shall be submitted to Lender for review and approval not less than five (5) business days prior to the date the Advance requested is to be funded.

(c)        Lender shall be under no obligation to fund the Initial Advance unless Borrower has delivered to Lender, (1) an executed Security Instrument (2) an executed Guaranty (3) an executed Note and (4) all other Loan Documents contemplated in this Agreement and such other documentation, in each case duly executed and in form and substance satisfactory to Lender, as may be reasonably required by Lender in its sole discretion.

(d)        Lender shall be under no obligation to fund an Additional Advance unless each of the following has occurred to the sole satisfaction of Lender: (1) a fully executed Request for Advance with

## EXHIBIT A

appropriate attachments have been delivered to Lender, (2) the Advance Processing Fee due, has been delivered to Lender; (3) the Advance is in respect of an applicable Advance Category, satisfies the Additional Advance Conditions related to such Advance Category and is in compliance with the Approved Budget and Schedule; (4) the Additional Advance would not cause the aggregate Additional Advances for such Advance Category to exceed the related Maximum Advance Category Amount, (5) there has occurred no default or event of default under this Agreement, the Mortgage, the Guaranty or under any lease, credit or other agreement or instrument to which Borrower, any affiliate of Borrower or any Guarantor and Lender or any affiliate of Lender are now or hereafter party; (6) no material adverse change has occurred in the operations, business, properties or condition, financial or otherwise, of the Borrower or Guarantor; and (7) all other applicable conditions precedent specified in this Agreement and required by Lender have been satisfied. If a Request for Advance or any portion thereof is acceptable to Lender and the applicable conditions precedent specified in this Agreement have been met to the satisfaction of Lender, Lender shall remit the amount of such Advance to the account of Borrower and indicate the amount and date of the Advance on the Schedule of Advances attached to the Note, provided, that the failure of the Lender to make any such recordation or notation shall not affect the obligations of the Borrower to make a payment when due of any amount owing hereunder in respect of any Advance.

(e)    Lender may require any or all of the following at the expense of Borrower as a condition to the funding of an Advance:

(1)    an inspection by Lender of the Mortgaged Property and the applicable replacement or repair; and

(2)    an inspection or certificate of completion by an appropriate independent qualified professional (such as an architect, engineer or property inspector, depending on the nature of the Repair or Replacement) selected by Lender; and

(3)    either:

(i)    a search of title to the Mortgaged Property effective to the date of disbursement; or

(ii)    a "date-down" endorsement to Lender's Title Policy (or a new Lender's Title Policy if a "date-down" is not available) extending the effective date of such policy to the date of disbursement, and showing no Liens other than i) Permitted Encumbrances, ii) liens which Borrower is diligently contesting in good faith that have been bonded off to the satisfaction of Lender, or iii) mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(4)    an acknowledgement of payment, waiver of claims, and release of lien for work performed and materials supplied from each contractor, subcontractor, or materialman in accordance with the requirements of applicable law and covering all work performed and materials supplied (including equipment and fixtures) for the Mortgaged Property by that contractor, subcontractor, or materialman through the date covered by the disbursement request (or, in the event that payment to such contractor, subcontractor, or materialman is to be made by a joint check, the release of lien shall be effective through the date covered by the previous disbursement).

Section 3.    Payments; Prepayment.

EXHIBIT A

(a)      Borrower covenants and agree to pay the Indebtedness in accordance with the terms of this Loan Agreement and the other Loan Documents and to perform, observe, and comply with this Loan Agreement and all other provisions of the other Loan Documents.

(b)      Interest on all outstanding Advances shall accrue from the date such Advance is made until the date the Principal Amount is repaid in full as described below. Interest on all outstanding Advances shall be paid by Borrower on a monthly basis in arrears, on the Interest Payment Date commencing the month following the month in which the first Advance is funded, and shall accrue at a rate per annum equal to Interest Rate and shall be computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months.

(c)      Borrower shall pay to Lender the Principal Amount plus all Accrued Interest and any and all other amounts due and unpaid hereunder upon the earliest to occur of (i) the Maturity Date, (ii) such date as Lender shall determine, in its sole discretion and in good faith, that there has been a material adverse change in the operations, business, properties or condition, financial or otherwise of Borrower or any Guarantor, (iii) acceleration upon the occurrence of an event of default or otherwise pursuant to Section 7 hereof and (iv) such date as Borrower elects to prepay in full the Principal Amount plus the accrued but unpaid interest hereon.

(d)      Borrower shall pay to Lender the Exit Fee on the Maturity Date.

(e)      On the Effective Date, Borrower shall pay to Lender the Origination Fee.

(f)      In the event any amount due hereunder is not paid within ten (10) days of the date when due, Borrower agrees to pay an administrative and late charge equal to the lesser of (a) five percent (5%) on and in addition to the amount of such overdue amount, or (b) the maximum charges allowable under applicable law. In addition, Borrower shall pay overdue interest on any delinquent amounts due hereunder from thirty (30) days after the due date thereof through the date of payment thereof at a rate of interest equal to the lesser of (x) 1.5% per month, or (y) the maximum rate of interest allowable under then applicable law. For the avoidance of doubt, Borrower acknowledges and agrees amounts on deposit in any Collateral Account shall in no event be used to pay such late charges or default interest.

(g)      Each payment hereunder shall be made in lawful money of the United States and shall be payable to such account or address as the Lender hereof shall from time to time direct Borrower. Whenever any payment to be made under this Loan Agreement shall be stated to be due on a Saturday, Sunday or a public holiday, or the equivalent for banks generally under the laws of the State of California or the State in which the Land is located, such payment shall be made on the preceding Business Day. All amounts received hereunder or in respect of this Loan Agreement shall be applied first, to accrued late charges and any other costs or expenses due and owing hereunder; second, to Accrued Interest; and third, to unpaid principal. No amount borrowed and repaid hereunder (whether upon demand, conversion to permanent financing or otherwise) may be reborrowed. It is the intention of Lender to comply with all applicable usury laws. Accordingly, it is agreed that notwithstanding anything to the contrary contained herein, in no event shall any provision contained herein require or permit interest in excess of the maximum amount permitted by applicable law to be paid by Borrower. If necessary to give effect to these provisions, Lender will, at its option, in accordance with applicable law, either refund any amount to Borrower to the extent that it was in excess of that allowed by applicable law or credit such excess amount against the then unpaid principal balance hereunder.

(h)      Borrower may voluntarily prepay the Mortgage Loan in full on any date so long as:
(1)      Borrower delivers to Lender a notice specifying the intended prepayment date not more than sixty (60) days, but not less than twenty (20) days (if given via U.S. Postal Service) or

EXHIBIT A

fifteen (15) days (if given via facsimile, e-mail, or overnight courier) prior to such intended prepayment date; and

    (2)      Borrower pays to Lender an amount equal to the sum of:

          (A)      the Principal Amount; plus

          (B)      all Accrued Interest (calculated through the last day of the month in which the prepayment occurs); plus

          (C)      the Exit Fee; plus

          (D)      all other Indebtedness.

In connection with any such voluntary prepayment, Borrower acknowledges and agrees that interest shall always be calculated and paid through the last day of the month in which the prepayment occurs (even if the prepayment date for such month is not the last day of such month). If Borrower fails to prepay the Mortgage Loan on the intended prepayment date for any reason and such failure either continues for five (5) Business Days, or into the following month, Lender shall have the right to recalculate the payoff amount. If Borrower prepays the Mortgage Loan either in the following month or more than five (5) Business Days after the Intended Payoff Date that was approved by Lender, Lender shall also have the right to recalculate the payoff amount based upon the amount of such payment and the date such payment was received by Lender. Borrower shall immediately pay to Lender any additional amounts required by any such recalculation.

    **Section 4.**      **Representations and Warranties**. Borrower represents, warrants and agrees that as of the date hereof and on each day that any Advance is outstanding:

    (a)      Borrower is duly organized and existing in good standing under the laws of the state described above and all other jurisdictions where legally required in order to carry on its business, shall maintain its good standing in all such jurisdictions, and shall conduct its businesses and manage its properties in compliance with all applicable laws, rules or regulations binding on Borrower;

    (b)      The execution, delivery and performance of this Agreement, each related agreement to which it is a party and the Approved Budget and Schedule has been duly authorized by Borrower, each of which are and will be binding on and enforceable against Borrower in accordance with their terms, and do not and will not contravene any other instrument or agreement binding on Borrower;

    (c)      There is no pending litigation, tax or environmental claim, proceeding, dispute or regulatory or enforcement action (and Borrower shall promptly notify Lender of any of the same that may hereafter arise) that may adversely affect the Mortgaged Property, any Invoice or Borrower's financial condition or impair its ability to perform its obligations under this Agreement, each other Loan Document, any related agreement and each Invoice.

    (d)      Borrower is the sole owner or ground lessee of the Mortgage Property. No part of the Land is included or assessed under or as part of another tax lot or parcel, and no part of any other property is included or assessed under or as part of the tax lot or parcels for the Land.

    (e)      The Mortgaged Property is located on or adjacent to a public road and has direct legal access to such road, or has access via an irrevocable easement or irrevocable right of way permitting ingress and egress to/from a public road.

Bridge Loan #▮▮▮▮▮▮

EXHIBIT A

(f)      The Mortgaged Property is served by or has uninhibited access rights to public or private water and sewer (or well and septic) and all required utilities, all of which are appropriate for the current use of the Mortgaged Property.

(g)      Borrower has complied with all laws, ordinances, statutes, rules, and regulations of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, statutes, rules and regulations, and covenants pertaining to construction of improvements on the Land, fair housing, and requirements for equal opportunity, anti-discrimination, environmental protection, and Leases.

(h)      All material Improvements that were included for the purpose of determining the appraised value of the related Mortgaged Property as of the Effective Date are within the boundaries of the related Mortgaged Property, except encroachments that do not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements were obtained under the Title Policy.  No Improvements on adjoining parcels encroach onto the related Mortgaged Property except for encroachments that do not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements were obtained under the Title Policy.  No Improvements encroach upon any easements except for encroachments, the removal of, which would not materially and adversely affect the value or current use of such Mortgaged Property or for which insurance or endorsements obtained with respect to the Title Policy.

(i)   Borrower is sole owner of the Mortgaged Property.

(j)   Until the Indebtedness is fully paid, Borrower:

(1)      unless Borrower is an individual, shall not acquire or lease any real property, personal property or other assets other than the Mortgaged Property;

(2)      unless Borrower is an individual, shall not acquire, own, operate, or participate in any business other than the leasing, ownership, management, operation and maintenance, of the Mortgaged Property;

(3)      shall not commingle its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(4)      shall accurately maintain its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets are included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)      shall have no material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement or other agreement or instrument to which the Borrower is a part, or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)      unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property, provided that any trade payables (i) are not evidenced by a promissory note, and (ii) are paid within sixty (60) days of the due date of such trade payable;

(B)      if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate; and

EXHIBIT A

(C)      obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents.

(6)      shall not assume, guaranty, or pledge its assets to secure the liabilities or obligations of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(7)      shall not make loans or advances to any other Person; or

(8)      shall not enter into, or become a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**Section 5.     Covenants.**

(a)      **Maintenance of Existence; Organizational Documents.**

Borrower shall maintain its existence, its entity status, franchises, rights, and privileges under the laws of the state of its formation or organization (as applicable).  Borrower shall continue to be duly qualified and in good standing to transact business in each jurisdiction in which qualification or standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to do so would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability, or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document.  Neither Borrower nor any partner, member, manager, officer, or director of Borrower shall:

(1)      make or allow any material change to the organizational documents or organizational structure of Borrower, including changes relating to the Control of Borrower, or

(2)      (A) file any action, complaint, petition, or other claim to:

(B) divide, partition, or otherwise compel the sale of the Mortgaged Property, or

(C) otherwise change the Control of Borrower.

(b)      **Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.**

(1)      Borrower shall at all times remain, and shall cause Guarantor and any Person Controlling Borrower or Guarantor, or any Person Controlled by Borrower or Guarantor that also has a direct or indirect ownership interest in any of them to remain, in compliance with:

(A)      any applicable anti-money laundering laws, including those contained in the Bank Secrecy Act;

(B)      any applicable anti-drug trafficking, anti-terrorism, or anti-corruption laws, civil or criminal; and

(C)      any applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce

(c)      **Payment of Taxes, Assessments, and Other Charges.**  Borrower shall file all federal, state, county, and municipal tax returns and reports required to be filed by Borrower and shall pay, before any fine, penalty, interest, or cost may be added thereto, all taxes payable with respect to such returns and reports.

(d)      **Borrower Status.**  Until the Indebtedness is fully paid, Borrower, unless Borrower is a natural person or persons or the Maximum Loan Amount is not in excess of $2,000,000.00:



 EXHIBIT A

    (1)    shall not acquire or lease any real property, personal property or other assets other than the Mortgaged Property;

    (2)    shall not acquire, own, operate, or participate in any business other than the leasing, ownership, management, operation and maintenance, of the Mortgaged Property;

    (3)    shall not assume, guaranty, or pledge its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument) or hold out its credit as being available to satisfy the obligations of any other Person;

    (4)    shall not make loans or advances to any other Person; or

    (5)    shall not enter into, or become a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

(e)    **ERISA.**  Borrower covenants that:

    (1)    no asset of Borrower shall constitute "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

    (2)    no asset of Borrower shall be subject to the laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

    (3)    neither Borrower nor any ERISA Affiliate shall incur any obligation or liability with respect to any ERISA Plan.

(f)    **Notice of Litigation or Insolvency.**  Borrower shall give immediate written notice to Lender of any claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceeding) by or before any Governmental Authority pending or, to Borrower's knowledge, threatened against or affecting Borrower or Guarantor or the Mortgaged Property, which claims, actions, suits, or proceedings, if adversely determined reasonably would be expected to materially adversely affect the financial condition or business of Borrower or Guarantor or the condition, operation, or ownership of the Mortgaged Property (including any claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

(g)    **Payment of Costs, Fees, and Expenses.**  In addition to the payments specified in this Loan Agreement, Borrower shall pay, on demand, all of Lender's out-of-pocket fees, costs, charges, or expenses (including the reasonable fees and expenses of attorneys, accountants, and other experts) incurred by Lender in connection with:

    (1)    any amendment to, or consent, or waiver required under, this Loan Agreement or any of the Loan Documents (whether or not any such amendments, consents, or waivers are entered into);

    (2)    defending or participating in any litigation arising from actions by third parties and brought against or involving Lender with respect to:

    (A) the Mortgaged Property;

    (B) any event, act, condition, or circumstance in connection with the Mortgaged Property; or

Bridge Loan #▮▮▮▮▮

**EXHIBIT A**

(C) the relationship between Lender, Borrower and Guarantor in connection with this Loan Agreement or any of the transactions contemplated by this Loan Agreement;

(3)    the administration or enforcement of, or preservation of rights or remedies under, this Loan Agreement or any other Loan Documents including or in connection with any litigation or appeals, any Foreclosure Event or other disposition of any collateral granted pursuant to the Loan Documents; and

(4)    any Bankruptcy Event or Guarantor Bankruptcy Event.

(h)    **Restrictions on Distributions.**  Borrower shall not declare or make any distributions or dividends of any nature to any Person having an ownership interest in Borrower if an Event of Default has occurred and is continuing.

(i)    **Use of Property.**  From and after the Effective Date, Borrower shall not without the prior written approval of Lender, unless required by applicable law or Governmental Authority:

(1)    allow changes in the use of all or any part of the Mortgaged Property;

(2)    convert any individual residential dwelling units or common areas to commercial use;

(3)    initiate or acquiesce in a change in the zoning classification of the Land;

(4)    establish any condominium or cooperative regime with respect to the Mortgaged Property;

(5)    subdivide the Land; or

(6)    suffer, permit, or initiate the joint assessment of any Mortgaged Property with any other real property constituting a tax lot separate from such Mortgaged Property which could cause the part of the Land to be included or assessed under or as part of another tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

(j)    **Property Maintenance.**  Borrower shall:

(1)    pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, repairs, and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

(2)    keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality) and restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not insurance proceeds are or any condemnation award is available to cover any costs of such restoration or repair;

(3)    if applicable, provide for professional management of the Mortgaged Property by a property manager satisfactory to Lender under a contract approved by Lender in writing;

(4)    give written notice to Lender of, and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security for the Mortgage Loan, or Lender's rights under this Loan Agreement; and

Bridge Loan #▮▮▮▮▮▮

EXHIBIT A

(5)    upon Lender's written request, submit to Lender any contracts or work orders with respect to the Mortgaged Property.

(k)    **Property Preservation.** Borrower shall:

(1)    not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property;

(2)    not engage in or knowingly permit, and shall take appropriate measures to prevent and abate or cease and desist, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Land or otherwise materially impair the lien created by the Security Instrument or Lender's interest in the Mortgaged Property;

(3)    not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage required by this Loan Agreement; or

(4)    not subject the Mortgaged Property to any voluntary, elective, or non-compulsory tax lien or assessment (or opt in to any voluntary, elective, or non-compulsory special tax district or similar regime).

(l)    **Property Inspections.** Borrower shall:

(1)    permit Lender, its agents, representatives, and designees to enter upon and inspect the Mortgaged Property (including in connection with any replacement or repair, or to conduct any Environmental Inspection pursuant to the Environmental Indemnity Agreement), and shall cooperate and provide access to all areas of the Mortgaged Property (subject to the rights of tenants under the Leases):

(A)    during normal business hours or at such other reasonable time upon reasonable notice of not less than one (1) Business Day;

(B)    at any time when exigent circumstances exist; or

(C)    at any time after an Event of Default has occurred and is continuing; and

(2)    pay for reasonable costs or expenses incurred by Lender or its agents in connection with any such inspections.

(m)    **Compliance with Laws.** Borrower shall:

(1)    comply with all laws, ordinances, statutes, rules, and regulations of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, statutes, rules and regulations, and covenants pertaining to construction of improvements on the Land, fair housing, and requirements for equal opportunity, anti-discrimination, environmental protection, and Leases;

(2)    maintain all required permits, licenses, and certificates necessary to comply with all zoning and land use statutes, laws, ordinances, rules and regulations, and all applicable health, fire, safety, and building codes and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent;

(3)    comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits;

(4)    at all times maintain records sufficient to demonstrate compliance with the provisions of this paragraph 5(m); and

Page **9** of **33**
Bridge Loan #

EXHIBIT A

(5)   promptly after receipt or notification thereof, provide Lender copies of any building code or zoning violation from any Governmental Authority with respect to the Mortgaged Property.

(n)   **Leases.** Borrower shall:

(1)   require that all leases, subleases, licenses, concessions or grants or other possessory interests, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof, be in writing;

(2)   comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits;

(3)   surrender possession of the Mortgaged Property, including all Leases and all security deposits and prepaid Rents, immediately upon appointment of a receiver or Lender's entry upon and taking of possession and control of the Mortgaged Property, as applicable;

(4)   not permit any Lease to contain an option to purchase or right of first refusal to purchase or right of first offer to purchase (except when such option or right is required by applicable law); and

(5)   promptly provide Lender a copy of any Lease upon Lender's written request.

(6)   With respect to any Lease, Borrower shall not:

(A)   enter into any Lease that materially alters the use and type of operation of the premises subject to the Lease in effect as of the Effective Date or reduces the number or size of units at the Mortgaged Property; or

(B)   modify the terms of any Lease (including any Lease in existence on the Effective Date) in any way that materially alters the use and type of operation of the premises subject to such Lease in effect as of the Effective Date, or reduces the number or size of units at the Mortgaged Property.

(7)   With respect to any Lease, Borrower shall cause the applicable tenant to provide within ten (10) days after a request by Lender, a certificate of estoppel, or if not provided by tenant within such ten (10) day period, Borrower shall provide such certificate of estoppel, certifying:

(A)   that such Lease is unmodified and in full force and effect (or if there have been modifications, that such Lease is in full force and effect as modified and stating the modifications);

(B)   the term of the Lease including any extensions thereto;

(C)   the dates to which the Rent and any other charges hereunder have been paid by tenant;

(D)   the amount of any security deposit delivered to Borrower as landlord;

(E)   whether or not Borrower is in default (or whether any event or condition exists which, with the passage of time, would constitute an event of default) under such Lease;

(F)   the address to which notices to tenant should be sent; and

(G)   any other information as may be reasonably required by Lender.

(o)   **Payment of Rents.** Borrower shall:

EXHIBIT A

(1)     pay to Lender upon demand all Rents after an Event of Default has occurred and is continuing;

(2)     cooperate with Lender's efforts in connection with the assignment of Rents set forth in the Security Instrument; and

(3)     not accept Rent under any Lease (whether residential or non-residential) for more than two (2) months in advance.

(p)     **Assignment of Rents.**  Borrower shall not:

(1)     perform any acts and shall not execute any instrument that would prevent Lender from exercising its rights under the assignment of Rents granted in the Security Instrument or in any other Loan Document; or

(2)     interfere with Lender's collection of such Rents.

(q)     **Further Assignments of Leases and Rents.**  Borrower shall execute and deliver any further assignments of Leases and Rents as Lender may reasonably require.

(r)     **Lease Requirements.**  Each Lease, including any renewal or extension of any Lease in existence as of the Effective Date, shall provide, directly or pursuant to a subordination, non-disturbance and attornment agreement approved by Lender, that:

(1)     the tenant shall, upon written notice from Lender after the occurrence of an Event of Default, pay all Rents payable under such Lease to Lender;

(2)     such Lease and all rights of the tenant thereby are expressly subordinate to the lien of the Security Instrument;

(3)     the tenant shall attorn to Lender and any purchaser at a Foreclosure Event (such attornment to be self-executing and effective upon acquisition of title to the Mortgaged Property by any purchaser at a Foreclosure Event or by Lender in any manner);

(4)     the tenant agrees to execute such further evidences of attornment as Lender or any purchaser at a Foreclosure Event may from time to time request; and

(5)     such Lease shall not terminate as a result of a Foreclosure Event unless Lender or any other purchaser at such Foreclosure Event  affirmatively elects to terminate such Lease pursuant to the terms of the subordination, non-disturbance and attornment agreement.

(s)     **Rent Schedule.**  Borrower shall furnish to Lender, within ten (10) days after a request by Lender to do so, a true, correct, complete and current schedule of all Leases affecting the Property, certified by Borrower as being true and correct, which accurately and completely sets forth in all material respects for each such lease, the following: the name of the tenant, the space occupied, the square footage of the space occupied, the Lease start date, the Lease expiration date, extension and renewal provisions, the base rent payable, any other monthly charges or other amounts owed, the security deposit held thereunder, the rent payable for the current month, the date through which rent has been paid, any other material provisions of such Lease, and any related information requested by Lender.  Borrower (i) shall not do or suffer to be done any act, or omit to take any action, that might result in a default by the landlord, lessor or licensor under any such Lease or allow the tenant thereunder to withhold payment of rent or cancel or terminate same; (ii) shall not further assign any such Lease or the Rents; (iii) shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under such Leases; and (iv) shall not consent to any assignment of or subletting under any Lease not in accordance with its terms.

(t)     **Insurance Requirements.**

EXHIBIT A

(1)   As required by Lender and applicable law, and as may be modified from time to time, Borrower shall:

(A) keep the Improvements insured at all times against any hazards, which insurance shall include coverage against loss by fire and all other perils insured by the "special causes of loss" coverage form, general boiler and machinery coverage, business income coverage, and flood (if any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor) as an area having special flood hazards and to the extent flood insurance is available in that area), and may include sinkhole insurance, mine subsidence insurance, earthquake insurance, terrorism insurance, windstorm insurance and, if the Mortgaged Property does not conform to applicable building, zoning, or land use laws, ordinance, and law coverage;

(B) maintain at all times commercial general liability insurance, workmen's compensation insurance, and such other liability, errors and omissions, and fidelity insurance coverage; and

(C) maintain builder's risk and public liability insurance, and other insurance in connection with completing the repairs or replacements, as applicable.

(u)   **Delivery of Policies, Renewals, Notices, and Proceeds.**  Borrower shall:

(1)   cause all insurance policies (including any policies not otherwise required by Lender) which can be endorsed with standard non-contributing, non-reporting mortgagee clauses making loss payable to Lender (or Lender's assigns) to be so endorsed;

(2)   promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums;

(3)   provide immediate written notice to the insurance company and to Lender of any event of loss;

(4)   execute such further evidence of assignment of any insurance proceeds as Lender may require; and

(5)   provide immediate written notice to Lender of Borrower's receipt of any insurance proceeds under any insurance policy required by paragraph 5(t)(1)(A) above and, if requested by Lender, deliver to Lender all of such proceeds received by Borrower to be applied by Lender at Lender's option.

Borrower acknowledges that Lender's insurance requirements may change from time to time. All insurance policies and renewals of insurance policies required by this Loan Agreement shall be:

(1)   in the form and with the terms required by Lender;

(2)   in such amounts, with such maximum deductibles and for such periods required by Lender; and

(3)   issued by insurance companies satisfactory to Lender.

(v)   **Liens; Encumbrances.**  Borrower shall not permit the grant, creation, or existence of any Lien, whether voluntary, involuntary, or by operation of law, on all or any portion of the Mortgaged Property (including any voluntary, elective, or non-compulsory tax lien or assessment pursuant to a voluntary, elective, or non-compulsory special tax district or similar regime) other than:

(1)   Permitted Encumbrances;

Bridge Loan #

EXHIBIT A

(2)      the creation of any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within sixty (60) days after the earlier of the date Borrower has actual notice or constructive notice of the existence of such lien, or the creation of any mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(3)      the lien created by the Loan Documents.

(w)    **Transfers.**

(1)      **Mortgaged Property.**  Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than:

(A)      a Transfer to which Lender has consented in writing;

(B)      Leases permitted pursuant to the Loan Documents;

(C)      a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality which are free of Liens (other than those created by the Loan Documents);

(D)      the grant of an easement, servitude, or restrictive covenant to which Lender has consented, and Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request;

(E)      a lien permitted pursuant to paragraph 5(v) of this Loan Agreement; or

(F)      the conveyance of the Mortgaged Property following a Foreclosure Event.

(2)      **Interests in Borrower or Guarantor.**  Other than a Transfer to which Lender has consented in writing, Borrower shall not Transfer, or cause or permit to be Transferred:

(A)      any direct or indirect ownership interest in Borrower or Guarantor (if applicable) if such Transfer would cause a change in Control;

(B)      any or all of Guarantor's direct or indirect ownership interests in Borrower that existed on the Effective Date (individually or on an aggregate basis); or

(C)      the economic benefits or rights to cash flows attributable to any ownership interests in Borrower or Guarantor (if applicable) separate from the Transfer of the underlying ownership interests if the Transfer of the underlying ownership interest is prohibited by this Loan Agreement.

(3)      **Name Change or Entity Conversion.**  Borrower shall not change its name, jurisdiction of organization, or convert from one type of legal entity into another type of legal entity for any lawful purpose without the prior written consent of the Lender.

(x)    **No Other Indebtedness and Mezzanine Financing.**  Other than the Mortgage Loan, Borrower shall not incur or be obligated at any time with respect to any loan or other indebtedness (except trade payables as otherwise permitted in this Loan Agreement), including any indebtedness secured by a Lien on, or the cash flows from, the Mortgaged Property.  Neither Borrower nor any direct or indirect owner of Borrower shall (1) incur any "mezzanine debt" or issue any Preferred Equity other than Permitted Preferred Equity, or (2) incur any similar indebtedness or issue any similar equity.

EXHIBIT A

(y)    **Further Assurances.**  Within ten (10) days after request by Lender, Borrower shall execute, acknowledge, and deliver, at its cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, and assurances as Lender may reasonably require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents.

**Section 6.**    **Mortgage Loan Administration Matters Regarding Liens, Transfers, and Assumptions**

(a)    **Acceleration or "Due on Sale" provision.**  If Borrower shall sell, convey, or alienate the Mortgaged Property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner of way, whether voluntarily or involuntarily, without the written consent of the Lender being first had and obtained, Lender shall have the right, at its option, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any note evidencing the same, immediately due and payable.

(b)    **Death of Borrower or Guarantor.**  A Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person who is a Guarantor or an owner of the Mortgaged Property shall not be deemed an unpermitted Transfer.

(c)    **Further Conditions to Transfers and Assumption.**

(1)    In connection with any Transfer of the Mortgaged Property, or an ownership interest in Borrower or Guarantor for which Lender's approval is required under this Loan Agreement, Lender may, as a condition to any such approval, require:

(A)    additional collateral, guaranties, or other credit support to mitigate any risks concerning the proposed transferee or the performance or condition of the Mortgaged Property;

(B)    amendment of the Loan Documents to delete or modify any specially negotiated terms or provisions previously granted for the exclusive benefit of original Borrower or Guarantor and to restore the original provisions of the documents, to the extent such provisions were previously modified.

(2)    In connection with any request by Borrower for consent to a Transfer, Borrower shall pay to Lender upon demand:

(A)    the Transfer Fee (to the extent charged by Lender);

(B)    the Review Fee (regardless of whether Lender approves or denies such request); and

(C)    all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the Transfer request, to the extent such costs exceed the Review Fee and regardless of whether Lender approves or denies such request.

(d)    **Financing Statements.**

Borrower hereby authorizes Lender to file any financing statements, continuation statements, termination statements, and amendments (including an "all assets" or "all personal property" collateral description or words of similar import) in form and substance as Lender may require in order to protect and preserve Lender's lien priority and security interest in the Mortgaged Property (and to the extent Lender has filed any such financing statements, continuation statements, or amendments prior to the Effective Date, such filings by Lender are hereby authorized and ratified by Borrower).

EXHIBIT A

Page **14** of **33**

Bridge Loan #

(e)    **Loan Document Taxes.**  Borrower shall pay, on demand, any transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents or the Mortgage Loan.

**Section 7.**        **Events of Default.**  The occurrence of any one or more of the following in this Section 7 shall constitute an Event of Default under this Loan Agreement.

(a)    **Automatic Events of Default.**  The following shall constitute automatic Events of Default:

(1)    any failure by Borrower to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document;

(2)    any failure by Borrower to maintain the insurance coverage required by any Loan Document;

(3)    any failure by Borrower to comply with the provisions of Section 5(d) relating to its single asset status;

(4)    if any warranty, representation, certification, or statement of Borrower, or Guarantor in this Loan Agreement or any of the other Loan Documents is false, inaccurate, or misleading in any material respect when made;

(5)    fraud, gross negligence, willful misconduct, or material misrepresentation or material omission by or on behalf of Borrower, or any of its officers, directors, trustees, partners, members, or managers, or Guarantor or any of their officers, directors, trustees, partners, members, or managers in connection with:

(A)    the application for, or creation of, the Indebtedness or any financial statement, rent roll, or other report or information provided to Lender in connection therwith;

(B)    any Invoice, financial statement, rent roll, or other report or information provided to Lender during the term of the Mortgage Loan; or

(C)    any request for Lender's consent to any proposed action, including a request for disbursement of funds on deposit in any Collateral Account;

(6)    the occurrence of any Transfer not permitted by the Loan Documents;

(7)    the occurrence of a Bankruptcy Event;

(8)    the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property; and

(9)    any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

(b)    **Events of Default Subject to a Specified Cure Period.**  The following shall constitute an Event of Default subject to the cure period set forth in the Loan Documents:

Page **15** of **33**
Bridge Loan # <span style="background:black;color:black">█████</span>

# EXHIBIT A

(1)    any failure by Borrower or Guarantor to comply with the provisions of Section 5(y); and

(2)    any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document.

(c)    **Events of Default Subject to Extended Cure Period.**  The following shall constitute an Event of Default if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan:

(1)    any other failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document as and when required.

(d)    **Acceleration; Foreclosure.**  If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given).  Lender may exercise this option to accelerate regardless of any prior forbearance.  In addition, Lender shall have all rights and remedies afforded to it hereunder and under the other Loan Documents, including, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to it at law or in equity (subject to Borrower's statutory rights of reinstatement, if any, prior to a Foreclosure Event).  Any proceeds of a foreclosure or other sale under this Loan Agreement or any other Loan Document may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement.  Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

(e)    **Loss of Right to Disbursements from Collateral Accounts.**  If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive further Advances or disbursements from any Collateral Accounts.  During the continuance of any such Event of Default, Lender may use funds on deposit in any Collateral Account (or any portion thereof) for any purpose, including:

(1)    repayment of the Indebtedness (however, such application of funds shall not cure or be deemed to cure any Event of Default);

(2)    reimbursement of Lender for all losses and expenses (including reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default;

(3)    completion of the replacement or repair or for any other replacement or repair to the Mortgaged Property; and

EXHIBIT A

(4)    payment of any amount expended in exercising (and the exercise of) all rights and remedies available to Lender at law or in equity or under this Loan Agreement or under any of the other Loan Documents.

Nothing in this Loan Agreement shall obligate Lender to apply all or any portion of the funds on deposit in any Collateral Account on account of any Event of Default by Borrower or to repayment of the Indebtedness or in any specific order of priority.

(f)    **Remedies Cumulative**.  Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by Borrower in order to exercise any of its remedies with respect to an Event of Default.

(g)    **No Effect Upon Obligations.**  Lender may, but shall not be obligated to, agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, Guarantor or other third party obligor, to take any of the following actions:

(1)    the time for payment of the principal of or interest on the Indebtedness may be extended, or the Indebtedness may be renewed in whole or in part;

(2)    the rate of interest on or period of amortization of the Mortgage Loan or the amounts payable under the Loan Documents may be modified;

(3)    the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(4)    the maturity of the Indebtedness may be accelerated as provided in the Loan Documents;

(5)    any or all payments due under this Loan Agreement or any other Loan Document may be reduced;

(6)    any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(7)    any amounts under this Loan Agreement or any other Loan Document may be released;

(8)    any security for the Indebtedness may be modified, exchanged, released, surrendered, or otherwise dealt with, or additional security may be pledged or mortgaged for the Indebtedness;

(9)    the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(10)    any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; or

(11)    any other terms of the Loan Documents may be modified.

Page **17** of **33**
Bridge Loan #▮▮▮▮▮▮

EXHIBIT A



(h)      **No Waiver of Rights or Remedies**.  Any waiver of an Event of Default or forbearance by Lender in exercising any right or remedy under this Loan Agreement or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of any other Event of Default or preclude the exercise or failure to exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise or failure to exercise of any other right available to Lender.  Lender's receipt of any condemnation awards or insurance proceeds shall not operate to cure or waive any Event of Default.

(i)      **Appointment of Lender as Attorney-In-Fact**.  Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any officer of Lender or any Person designated by Lender for that purpose) as Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Borrower's name, place, and stead, with full power of substitution, to:

(1)      use any of the funds in the funds on deposit in any Collateral Account for the purpose of making or completing any action or purchase set forth in the Approved Budget and Schedule;

(2)      make such additions, changes, and corrections to the Approved Budget and Schedule as shall be necessary or desirable to complete the actions and purchases set forth in the Approved Budget and Schedule;

(3)      employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for such purposes;

(4)      pay, settle, or compromise all bills and claims for materials and work performed in connection with the actions and purchases set forth in the Approved Budget and Schedule, or as may be necessary or desirable for the completion of the the actions and purchases set forth in the Approved Budget and Schedule, or for clearance of title;

(5)      adjust and compromise any claims under any and all policies of insurance required pursuant to this Loan Agreement and any other Loan Document, subject only to Borrower's rights under this Loan Agreement;

(6)      appear in and prosecute any action arising from any insurance policies;

(7)      collect and receive the proceeds of insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds;

(8)      commence, appear in, and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation;

(9)      settle or compromise any claim in connection with any condemnation;

(10)     execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

EXHIBIT A

(11)    prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the rehabilitation and repair of the Mortgaged Property;

(12)    take such actions as are permitted in this Loan Agreement and any other Loan Documents;

(13)    execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Lender's security interest in, and to enforce such interests in, the collateral; and

(14)    carry out any remedy provided for in this Loan Agreement and any other Loan Documents, including endorsing Borrower's name to checks, drafts, instruments and other items of payment and proceeds of the collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Lender, opening all envelopes addressed to Borrower, and applying any payments contained therein to the Indebtedness.

Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable and shall not be affected by the disability or incompetence of Borrower. Borrower specifically acknowledges and agrees that this power of attorney granted to Lender may be assigned by Lender to Lender's successors or assigns as holder of the Note (and the Mortgage Loan). However, the foregoing shall not require Lender to incur any expense or take any action. Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Loan Agreement and any other Loan Documents.

(j)    **Borrower Waivers**.  If more than one Person signs this Loan Agreement as Borrower, each Borrower, with respect to any other Borrower, hereby agrees that Lender, in its discretion, may:

(1)    bring suit against Borrower, or any one or more of Borrower, jointly and severally, or against any one or more of them;

(2)    compromise or settle with any one or more of the persons constituting Borrower, for such consideration as Lender may deem proper;

(3)    release one or more of the persons constituting Borrower, from liability; or

(4)    otherwise deal with Borrower, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from any Borrower the full amount of the Indebtedness.

(k)    **Waiver of Marshaling.**  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Loan Agreement, any other Loan Document or applicable law. Lender shall have the right to determine the order in which all or any part of the Indebtedness is satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Loan Agreement waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement or any other Loan Documents.

EXHIBIT A

**Section 8.**          **Personal Liability**

(a)          The Mortgage Loan is a full recourse loan and Borrower is personally liable for all obligations hereunder, including payment of the Indebtedness. Borrower shall be personally and fully liable to Lender for Borrower's indemnity obligations under Section 9 of this Loan Agreement, the Environmental Indemnity Agreement, and any other express indemnity obligations provided by Borrower under any Loan Document. Borrower's liability for such indemnity obligations shall not be limited by the amount of the Indebtedness, the repayment of the Indebtedness, or otherwise, provided that Borrower's liability for such indemnities shall not include any loss caused by the gross negligence or willful misconduct of Lender as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

(b)          Lender may exercise its rights against Borrower personally to the fullest extent permitted by applicable law without regard to whether Lender has exercised any rights against the Mortgaged Property, the UCC Collateral, or any other security, or pursued any rights against Guarantor, or pursued any other rights available to Lender under this Loan Agreement, any other Loan Document, or applicable law. To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Section 8, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability.

**Section 9.**          **Indemnification.** The Borrower agrees to pay as and when billed by the Lender all of the reasonable out-of-pocket costs and expenses incurred in connection with the consummation and administration of the transactions contemplated hereby and thereby including, without limitation, (i) all the reasonable fees, disbursements and expenses of counsel to the Lender and (ii) all the due diligence, inspection, testing and review costs and expenses incurred by the Lender with respect to Collateral under this Loan Agreement. The Borrower agrees to hold the Lender and its affiliates and their officers, directors, employees, agents and advisors (each an "Indemnified Party") harmless from and indemnify any Indemnified Party against any and all claims, suits, actions, proceedings, obligations, liabilities (including, without limitation, strict liabilities) and debts, and all losses, actual damages, judgments, awards, amounts paid in settlement of whatever kind or nature, fines, penalties, charges, costs and expenses of any kind (including, but not limited to, reasonable attorneys' fees and other costs of defense), which may be imposed on, incurred by or asserted against such Indemnified Party (collectively, the "Costs") relating to or arising out of this Loan Agreement, the Note, the Pledge Agreement any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Loan Agreement, the Note, the Pledge Agreement any other Loan Document or any transaction contemplated hereby or thereby, that, in each case, results from anything other than any Indemnified Party's gross negligence or willful misconduct.

**Section 10.**          **Miscellaneous**

(a)          This Loan Agreement and any other Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction without regard to the application of choice of law principles.

(b)          Any controversy arising under or in relation to this Loan Agreement or any other Loan Document shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Loan Agreement or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence, or otherwise.

EXHIBIT A

(c)     ANY WAIVER OF ANY OF LENDER'S RIGHTS OR REMEDIES SHALL BE EFFECTIVE ONLY IF SUCH WAIVER IS IN WRITING SIGNED BY LENDER AND ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE FOR WHICH IT IS GIVEN. NO FAILURE TO EXERCISE, OR DELAY IN EXERCISING, ANY RIGHT HEREUNDER SHALL OPERATE AS A WAIVER THEREOF; NOR SHALL ANY FAILURE TO EXERCISE, OR PARTIAL EXERCISE OR, ANY RIGHT HEREUNDER PRECLUDE ANY OTHER OR FURTHER EXERCISE THEREOF OR THE EXERCISE OF ANY OTHER RIGHT.

(d)     This Agreement, the Security Instrument, the other Loan Documents and their respective terms, provisions, supplements and amendments, and transactions and notices thereunder, are proprietary to the Lender, shall be held by the Borrower in strict confidence and shall not be disclosed to any third party without the consent of the Lender except for (i) disclosure to the Borrower's direct and indirect parent companies, directors, attorneys, agents or accountants, provided that such attorneys or accountants likewise agree to be bound by this covenant of confidentiality, or are otherwise subject to confidentiality restrictions, and (ii) disclosure required by law, rule, regulation or order of a court or other regulatory body.

(e)     **Process of Serving Notice.**  Except as otherwise set forth herein or in any other Loan Document, all notices under this Loan Agreement and any other Loan Document shall be:

        (1)     in writing and shall be:

          (A)          delivered, in person;

          (B)  mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

          (C)  sent by overnight courier; or

          (D)  sent by electronic mail with originals to follow by overnight courier;

        (2)     addressed to the intended recipient at Borrower's Notice Address and Lender's Notice Address set forth below, as applicable; and

        (3)     deemed given on the earlier to occur of:

          (E)   the date when the notice is received by the addressee; or

          (F)   if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

                Lenders' Notice Address:

                21680 Gateway Center Drive #230
                Diamond Bar, CA 91765

                Borrower's Notice Address:

                See Schedule 2 to this Loan Agreement

(f)     **Counterparts.**  This Loan Agreement may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same document and all such counterparts shall be construed together and shall constitute one instrument.

Bridge Loan # ▊

EXHIBIT A

(g)    **Joint and Several (or Solidary) Liability.**  If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several (solidary instead for purposes of Louisiana law

(h)    **Severability; Entire Agreement; Amendments.**  The invalidity or unenforceability of any provision of this Loan Agreement or any other Loan Document shall not affect the validity or enforceability of any other provision of this Loan Agreement or of any other Loan Document, all of which shall remain in full force and effect, including the Guaranty.  This Loan Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted, and the obligations assumed in this Loan Agreement.  This Loan Agreement may not be amended or modified except by written agreement signed by the parties hereto.

(i)    **No Reliance.**  Borrower acknowledges, represents, and warrants that:

(a)    it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents;

(b)    it is familiar with the provisions of all of the documents and instruments relating to such transactions;

(c)    it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property;

(d)    it has had the opportunity to consult counsel; and

(e)    it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

(j)    **Final Agreement.**

THIS LOAN AGREEMENT ALONG WITH ALL OF THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.    All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Loan Agreement and the other Loan Documents. This Loan Agreement, the other Loan Documents, and any of their provisions may not be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

(k)    **Waiver of Trial by Jury.**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (1) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER, THAT IS TRIABLE OF RIGHT BY A JURY AND (2) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

Bridge Loan #▮▮▮▮

# EXHIBIT A

**IN WITNESS WHEREOF**, Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives. Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER**:
**Alvarez Investement Group LLC**

By

Name: Joanna A. Burnley
Title:  CEO & Sole Member

**LENDER**:
NuBridge Commercial Lending LLC

By:
Name:   Jorge L. Ramos
Title:    Executive Vice President

Page **23** of **33**
Bridge Loan #

# EXHIBIT A

**SCHEDULE 1 TO**

**LOAN AGREEMENT**

**Definitions Schedule**

Capitalized terms used in the Loan Agreement and not otherwise defined have the meanings given to such terms in this Definitions Schedule.

"**Accrued Interest**" means unpaid interest, if any, on the Mortgage Loan.

"**Additional Advance**" means an advance for funds made by Lender pursuant to this Loan Agreement other than the Initial Advance.

"**Additional Advance Condition**" means, with respect to an Advance Category, each condition that must be satisfied to obtain an Additional Advance.

"**Advance**" means each advance for funds made by Lender pursuant to this Loan Agreement, including the Initial Advance and each Additional Advance.

"**Advance Category**" means the type of use for which an Additional Advance may be requested in respect of, as set forth in Schedule 2 attached hereto.

"**Advance Processing Fee**" means, with respect to an Advance Category, the processing fee required to process a Request for Advance for such Advance Category, as set forth in Schedule 2 attached hereto.

"**Advance Termination Date**" means the date the final Advance may occur, as set forth in Schedule 2 attached hereto.

"**Advance Category**" means the type of use for which an Additional Advance may be requested hereunder in respect of the Maximum Loan Amount, as set forth in Schedule 2 attached hereto.

"**Approved Budget and Schedule**" means the budget and schedule approved by Lender and attached to this Loan Agreement as Exhibit B.

"**Bank Secrecy Act**" means the Bank Secrecy Act of 1970, as amended (e.g., 31 U.S.C. Sections 5311-5330).

"**Bankruptcy Event**" means any one or more of the following:

(a)     the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower;

(b)     the acknowledgment in writing by Borrower (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c)     the making of a general assignment for the benefit of creditors by Borrower;

(d)     the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Borrower; or

(e)     the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Borrower or any substantial part of the assets of Borrower;

Page **24** of **33**
Bridge Loan #▮▮▮▮

**EXHIBIT A**

provided, however, that any proceeding or case under (d) or (e) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower or Guarantor, (2) any Person Controlling Borrower or Guarantor, or (3) any Person Controlled by or under common Control with Borrower or Guarantor (in which event such case or proceeding shall be a Bankruptcy Event immediately).

"**Borrower**" means, individually (and jointly and severally (solidarily instead for purposes of Louisiana law) if more than one), the entity (or entities) identified as "Borrower" in the first paragraph of the Loan Agreement.

"**Borrower Affiliate**" means, as to Borrower or Guarantor:

     (a)    any Person that owns any direct ownership interest in Borrower or Guarantor;

     (b)    any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in Borrower or Guarantor;

     (c)    any Person Controlled by, under common Control with, or which Controls, Borrower, or Guarantor;

     (d)    any entity in which Borrower or Guarantor directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity, or

     (e)    any other individual that is related (to the third degree of consanguinity) by blood or marriage to Borrower or Guarantor.

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a day on which Lender is not open for business, or (d) a day on which the Federal Reserve Bank of New York is not open for business.

"**Collateral Accounts**" means any account designated as such by Lender pursuant to a Collateral Agreement or as established pursuant to this Loan Agreement.

"**Collateral Agreement**" means any separate agreement between Borrower and Lender for the establishment of any other fund, reserve or account.

"**Condemnation Action**" has the meaning set forth in the Security Instrument.

"**Control**" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"**Default Rate**" means an interest rate equal to the lesser of:

     (a)    the sum of the Interest Rate plus five (5) percentage points; or

     (b)    the maximum interest rate which may be collected from Borrower under applicable law.

"**Definitions Schedule**" means this Schedule 1 (Definitions Schedule) to the Loan Agreement.

"**Employee Benefit Plan**" means a plan described in Section 3(3) of ERISA, regardless of whether the plan is subject to ERISA.

"**Enforcement Costs**" has the meaning set forth in the Security Instrument.

EXHIBIT A

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the Effective Date made by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Environmental Inspections**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to Borrower, any entity that, together with Borrower, would be treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code, or Section 4001(a)(14) of ERISA, or the regulations thereunder.

"**ERISA Plan**" means any employee pension benefit plan within the meaning of Section 3(2) of ERISA (or related trust) that is subject to the requirements of Title IV of ERISA, Sections 430 or 431 of the Internal Revenue Code, or Sections 302, 303, or 304 of ERISA, which is maintained or contributed to by Borrower or its ERISA Affiliates.

"**Event of Default**" means the occurrence of any event listed in Section 7 (Events of Default) of the Loan Agreement.

"**Exit Fee**" means the amount set forth in Schedule 2 attached hereto which Borrower shall pay to Lender, on the Maturity Date.

"**Fixtures**" has the meaning set forth in the Security Instrument.

"**Force Majeure**" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower), strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of Borrower (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

"**Foreclosure Event**" means:

      (a)     foreclosure under the Security Instrument;

      (b)     any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

      (c)     delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

      (d)     in Louisiana, any dation en paiement.

"**Governmental Authority**" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

EXHIBIT A

"**Guarantor**" means, individually and collectively, any guarantor of the Indebtedness or any other obligation of Borrower under any Loan Document.

"**Guarantor Bankruptcy Event**" means any one or more of the following:

(a)     the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Guarantor;

(b)     the acknowledgment in writing by Guarantor (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c)     the making of a general assignment for the benefit of creditors by Guarantor;

(d)     the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Guarantor; or

(e)     the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Guarantor or any substantial part of the assets of Guarantor, as applicable;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Guarantor Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, or Guarantor, (2) any Person Controlling Borrower or Guarantor, or (3) any Person Controlled by or under common Control with Borrower or Guarantor (in which event such case or proceeding shall be a Guarantor Bankruptcy Event immediately).

"**Guaranty**" means, individually and collectively, a guaranty for the benefit of Lender from Guarantor, dated the date hereof and in a form acceptable to Lender in its sole discretion, pursuant to which Guarantor shall guarantee payment of the Borrower's obligations hereunder and under the other Loan Documents.

"**Imposition Deposits**" has the meaning set forth in the Security Instrument.

"**Impositions**" has the meaning set forth in the Security Instrument.

"**Improvements**" has the meaning set forth in the Security Instrument.

"**Indebtedness**" has the meaning set forth in the Security Instrument.

"**Initial Advance**" has the meaning set forth in Schedule 2 to this Loan Agreement.

"**Insolvency Laws**" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

"**Insolvent**" means:

(a)     that the sum total of all of a specified Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of such Person's non-exempt assets, i.e., all of the assets of such Person that are available to satisfy claims of creditors; or

(b)     such Person's inability to pay its debts as they become due.

EXHIBIT A

"**Interest Rate**" means the per annum rate set forth in the Note on which interest accrues on all outstanding Advances.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Invoice**" means any each invoice for the purchase of goods or services necessary to complete or repair the Mortgaged Property and attached to an Advance Request.

"**Land**" means the land described in Exhibit A to the Security Instrument.

"**Leases**" has the meaning set forth in the Security Instrument.

"**Lender**" means the entity identified as "Lender" in the first paragraph of the Loan Agreement and its transferees, successors and assigns, or any subsequent holder of the Note.

"**Lien**" has the meaning set forth in the Security Instrument.

"**Loan Agreement**" means the Loan Agreement dated as of the Effective Date executed by and between Borrower and Lender to which this Definitions Schedule is attached, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Application**" means the application for the Mortgage Loan submitted by Borrower to Lender.

"**Loan Documents**" means the Note, the Loan Agreement, the Security Instrument, the Environmental Indemnity Agreement, the Guaranty, all guaranties, all indemnity agreements, all Collateral Agreements, all O&M Plans, and any other documents now or in the future executed by Borrower, Guarantor any other guarantor or any other Person in connection with the Mortgage Loan, as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan to Value Ratio**" means the fraction expressed as a percentage, the numerator of which is the outstanding principal balance of the Loan and the denominator of which is the fair market value of the Property.

"**Maturity Date**" has the meaning set forth in the Note.

"**Maximum Advance Category Amount**" means with respect to an Advance Category, the maximum dollar amount of Additional Advances that may be funded with respect to such Advance Category, as set forth on Schedule 2 attached hereto.

"**Maximum Loan Amount**" means the maximum aggregate dollar amount in Advances that may be funded by Lender pursuant to this Loan Agreement, as set forth on Schedule 2 attached hereto.

"**Maximum Request Number**" means with respect to an Advance Category, the maximum number of Additional Advances that may be funded with respect to such Advance Category, as set forth on Schedule 2 attached hereto

"**Mortgage Loan**" means the mortgage loan made by Lender to Borrower in the principal amount of the Note made pursuant to the Loan Agreement, evidenced by the Note and secured by the Loan Documents that are expressly stated to be security for the Mortgage Loan.

"**Mortgaged Property**" has the meaning set forth in the Security Instrument.

Bridge Loan #█████

# EXHIBIT A

"**Note**" means that certain Promissory Note of even date herewith in the original principal amount of the Maximum Loan Amount made by Borrower in favor of Lender, and all schedules, riders, allonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**O&M Plan**" has the meaning set forth in the Environmental Indemnity Agreement.

"**OFAC**" means the United States Treasury Department, Office of Foreign Assets Control, and any successor thereto.

"**Payment Guaranty**" means, if applicable, that certain Guaranty (Payment) of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Permitted Encumbrance**" has the meaning set forth in the Security Instrument.

"**Person**" means an individual, an estate, a trust, a corporation, a partnership, a limited liability company or any other organization or entity (whether governmental or private).

"**Personal Property**" means the Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"**Personalty**" has the meaning set forth in the Security Instrument.

"**Prohibited Person**" means:

    (a)    any Person with whom Lender is prohibited from doing business pursuant to any law, rule, regulation, judicial proceeding or administrative directive; or

    (b)    any Person identified on the United States Department of Housing and Urban Development's "Limited Denial of Participation, HUD Funding Disqualifications and Voluntary Abstentions List," or on the General Services Administration's "Excluded Parties List System," each of which may be amended from time to time, and any successor or replacement thereof; or

    (c)    any Person that is determined by Lender to pose an unacceptable credit risk due to the aggregate amount of debt of such Person owned or held by Lender; or

    (d)    any Person that has caused any unsatisfactory experience of a material nature with Lender, such as a default, fraud, intentional misrepresentation, litigation, arbitration or other similar act.

"**Property Jurisdiction**" has the meaning set forth in the Security Instrument.

"**Rents**" has the meaning set forth in the Security Instrument.

"**Request for Advance**" means a request made by the Borrower for Lender to fund an Additional Advance in the form attached hereto as Exhibit A.

EXHIBIT A

"**Restoration**" means restoring and repairing the Mortgaged Property to the equivalent of its physical condition immediately prior to the casualty or to a condition approved by Lender following a casualty.

"**Security Instrument**" means that certain mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Taxes**" has the meaning set forth in the Security Instrument.

"**Title Policy**" means the mortgagee's loan policy of title insurance issued in connection with the Mortgage Loan and insuring the lien of the Security Instrument as set forth therein, as approved by Lender.

"**Transfer**" means:

    (a)    a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law);

    (b)    a granting, pledging, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary, or by operation of law);

    (c)    an issuance or other creation of a direct or indirect ownership interest;

    (d)    a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity; or

    (e)    a merger, consolidation, dissolution or liquidation of a legal entity.

"**Transfer Fee**" means a fee equal to one percent (1%) of the unpaid principal balance of the Mortgage Loan payable to Lender in connection with a Transfer of the Mortgaged Property or of an ownership interest in Borrower or Guarantor for which Lender's consent is required (including in connection with an assumption of the Mortgage Loan).

"**UCC**" has the meaning set forth in the Security Instrument.

"**UCC Collateral**" has the meaning set forth in the Security Instrument.


                    **BORROWER**:
                    **Alvarez Investement Group LLC**


                    By
                    Name: Joanna A. Burnley
                    Title:  CEO & Sole Member

EXHIBIT A

### SCHEDULE 2 TO LOAN AGREEMENT

| I. | GENERAL PARTY AND PROJECT INFORMATION |
|---|---|
| Date of Loan Agreement | December 2, 2020 |
| Borrower | Alvarez Investement Group LLC |
| Borrower Notice Address | 640 Pine Ridge Trail SE, Conyers, GA 30094 |
| Lender | NuBridge Commercial Lending LLC |
| Guarantor | Joanna A. Burnley |
| Mortgaged Property Address | 3751 Martin Luther King Jr. Dr. SW, Atlanta, GA 30331 |
| **II.** | **LOAN TERMS AND ADDITIONAL ADVANCE CONDITIONS** |
| Maximum Loan Amount | $9,637,500.00 |
| Initial Advance | $9,637,500.00 |
| Interest Rate | 9.99% per annum |
| Amortization Type | Interest Only |
| Monthly Interest-Only Payment | $80,232.19 |
| First Payment Due Date | January 1, 2021 |
| Maturity Date | December 1, 2021 |
| Term to Maturity | 12 Months |
| Advance Category<br><br>(the type of use for which an Additional Advance may be requested hereunder in respect of the Maximum Loan Amount,) | N/A |

Initials _____ _____

Bridge Loan # ▓▓▓▓▓

## EXHIBIT A

| Maximum Advance Category Amount | N/A |
|---|---|
| Maximum Request Number | N/A |
| Additional Advance Conditions | N/A |
| Advance Processing Fee | N/A |
| Prepayment Premium | Payment in full of the outstanding principal balance will be subject to a prepayment premium equal to the product of (a) the Monthly Interest-Only Payment and (b) the number of months between the original loan term and the month of prepayment; provided, however, that no prepayment premium will be due if the loan is prepaid within **three (3)** months from the maturity date or the extension date, as the case may be. Partial prepayments of principal greater than one thousand dollars (**$1,000.00**) will be subject to a prepayment premium equal to five percent (**5.00%**). |
| Balloon Payment | On the Maturity Date, Borrower is required to pay off the then outstanding balance plus any accrued interest in a lump sum payment. |
| Late Charge | An amount equal to the delinquent amount then due under the Loan Documents multiplied by five percent (**5.00%**). |

EXHIBIT A

| | |
|---|---|
| **Interest Payment Reserve** | An Interest Payment Reserve in the amount of **$293,950.00** shall be retained by Lender to be applied on a monthly basis towards the payment of the monthly interest-only payment.<br><br>Commencing on the First Payment Due Date and continuing on the first day of each month thereafter, Borrower shall pay to Lender a payment of not less than **$55,736.75**. Upon receipt of such monthly payment by Borrower, Lender will advance from the Interest Payment Reserve an amount equal to the difference between (a) the monthly interest due based on the outstanding principal balance and the amount of Borrower's actual payment. Borrower's payment greater than **$55,736.75** will result in a reduction of Lender's advance from the Interest Payment Reserve.<br><br>Lender shall not be obligated to advance funds from the Interest Payment Reserve until and unless the Borrower's payment in good funds is received. Once the Interest Payment Reserve is fully disbursed, Lender shall make no further disbursements. Any funds available in the Interest Payment Reserve on the Maturity Date or earlier date of payment in full of the loan will be credited to Borrower on the loan payoff statement. The Interest Payment Reserve shall not bear interest.<br><br>If an Event of Default exists, Lender may, at its sole discretion, apply funds from the Interest Payment Reserve to reduce the principal owed. In such occurrence, Borrower shall be liable for the full Monthly Interest Payment, including Default Interest. |

**BORROWER**:
**Alvarez Investement Group LLC**

By _____

Name: Joanna A. Burnley

Title:  CEO & Sole Member

EXHIBIT A

## HOLDBACK AGREEMENT

THIS **HOLDBACK AGREEMENT** (this "**Agreement**") is entered into as of December 2, 2020, by and between NuBridge Commercial Lending LLC, a Delaware limited liability company (the "**Lender**"), and Alvarez Investement Group LLC, a Georgia Limited Liability Company ("**Borrower**").

### RECITALS:

**WHEREAS**, Lender and Borrower entered into that certain Commitment Letter dated December 1, 2020 (the "**Commitment**"), pursuant to which Lender agreed to make a loan to Borrower in the amount of $9,637,500.00 (the "**Loan**") to be secured by real property located at 3751 Martin Luther King Jr. Dr. SW, Atlanta, GA 30331 (the "**Real Property**").

**WHEREAS**, Lender's obligation to fund and close the Loan is conditioned upon the satisfaction of each of the conditions set forth in the Commitment including there being no other fact or disclosure that could in the Lender's judgment adversely affect the value or marketability of the Mortgage Loan or the Mortgaged Property (the "**Closing Conditions**").

**WHEREAS**, Borrower acknowledges that the Release Criteria (as defined herein) have not been met and therefore the Closing Conditions have not been met as of the date hereof (the "**Unsatisfied Condition**").

### AGREEMENT:

NOW, THEREFORE, in consideration of Lender's waving such condition precedent and funding and closing the Loan as of the date hereof, the parties hereto agree as follows:

1.    Waiver of Condition Precedent.

Subject to the terms and conditions of this Agreement, Lender agrees to waive the Unsatisfied Condition and disburse the Loan upon execution by Borrower of (a) that certain Promissory Note dated as of the date hereof, in the amount of the Loan and made payable to the order of Lender (the "**Note**"), (b) that certain Mortgage, Assignment of Leases and Rents and Fixture Filing, dated as of the date hereof (the "**Security Instrument**") pursuant to which Borrower irrevocably and unconditionally mortgages, grants and assigns to Lender the Mortgaged Property (as defined in the Security Instrument), including the Real Property and (b) that certain Loan and Security Agreement dated as of the date hereof, executed by and between Borrower and Lender (the "**Loan Agreement**"), setting forth the terms of the Loan and the repayment of the Indebtedness (as defined in the Security Instrument), and the performance of the covenants and agreements of Borrower contained in the other Loan Documents (as defined in the Loan Agreement). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Loan Agreement.

Holdback Agreement – Loan # ███    **EXHIBIT A**

2.    <u>Holdback of Loan Proceeds</u>.

Funds in the amount of $2,462,500.00 (the "**Holdback Amount**") to be disbursed under the Note, instead of being disbursed to Borrower, shall be deposited into an account held by Lender and disbursed to Borrower in accordance with paragraph 3 below.

3.    <u>Release of Holdback Amount</u>.

(a)  Borrower covenants and agrees to cause the following to occur with respect to the Mortgaged Property (collectively, the "<u>Release Criteria</u>"):

      (i)    Lender shall release holdback funds upon Borrower providing Lender with documentation and evidence of satisfactory completion of repair / rehab / construction items, compliance with city requirements and approval by city, as applicable.  Prior to disbursement Lender shall inspect property to confirm completion of repair / rehab / construction items. The scope of work is established on Exhibit A.

(b)  If by December 30, 2021 (the "Completion Date"), the Release Criteria has not been met to Lender's sole satisfaction, and Lender has not released the entire Holdback Amount to Borrower, such remaining Holdback Amount shall be applied by Lender, or the Servicer on its behalf, to reduce the then-outstanding principal amount of the Loan plus the Prepayment Premium due with respect to such payment and no amount thereof shall be paid to the Borrower. At Lender's option, the Holdback Amount may be disbursed in whole or in part prior to the Completion Date.

(c)    Borrower shall pay to Lender:

      (1)    the cost payable to a third-party to inspect the Mortgaged Property if the Lender deems necessary, which cost shall not exceed $500.00;

      (2)    upon demand and at Lender's or Loan Servicer's election, an administrative fee of $200.00 for each release of funds pursuant to this Agreement; and

      (3)    upon demand, all reasonable fees charged by any engineer, architect, inspector, or other person inspecting the Mortgaged Property on behalf of Lender in connection with the satisfaction of the Release Criteria, all fees incurred in connection with the recordation or filing, as applicable, of documentation requested by Lender to maintain a perfected, first priority security interest in the Mortgaged Property, plus all other reasonable costs and out-of-pocket expenses relating to the satisfaction of the Release Criteria.

The foregoing expenses may be netted by the Lender, at its election, from amounts to be released pursuant to this Agreement.

4.    <u>Event of Default</u>. Borrower understands that a default of its obligations under this Holdback Agreement shall be an Event of Default under the Loan Agreement (as provided in Section 7 thereof), and that Lender, at its option,  shall be entitled to exercise all of its rights and remedies under the Loan Agreement and other Loan Documents.

Holdback Agreement – Loan # ███

**EXHIBIT A**

5.     <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by the Borrower without the prior written consent of the Lender.

6.     <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Georgia without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction.  Borrower agrees that any controversy arising under or in relation to this Agreement shall be litigated exclusively in the Property Jurisdiction.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

7.     <u>Severability</u>.  In case any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

8.     <u>Miscellaneous</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  This Agreement embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein and may not be modified orally, but only by a writing signed by both parties to this Agreement.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  This Agreement supersedes all prior agreements and understandings (whether oral or written) between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Holdback Agreement – Loan # ███        **EXHIBIT A**        Page 3 of 4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**Lender:**

NuBridge Commercial Lending LLC

By:
Name: Manny Rubalcava
Title:   SVP, Credit Underwriting

**Borrower:**

Alvarez Investement Group LLC

By:
Name: Joanna A. Burnley
Title: CEO & Sole Member

Exhibit A
to Holdback Agreement

| Metropolitan Gardens Buildings E, F & G Completion Estimates | | | |
|---|---|---|---|
| QUANTITY | DESCRIPTION | AMOUNT | NOTES |
| | **BUILDING (G) 16 UNITS** | | **Building G:** This building has been roofed |
| | DRYWALL & INSULATION | $ 124,000.00 | framed and windows installed. It has passed its |
| | PLUMBING | $ 63,947.40 | firewall, insulation, plumbing, electrical and |
| | FLOORING | $ 70,438.00 | HVAC roughing inspections. It is ready for |
| | RAILINGS AND IRON WORK FOR E,F & G | $ 46,200.00 | drywall and finishing. This building can be |
| | ELECTRIC | $ 50,160.00 | completed in 3-4 months subject to City of |
| | HVAC | $ 54,494.00 | Atlanta inspection schedule. Please note that |
| | TRIM WORK | $ 26,400.00 | buiding G has 16 units. |
| | TILE WORK IN BATHROOMS | $ 21,120.00 | **To be done by April 2021** |
| | KITCHEN CABINETS & COUNTERTOPS | $ 50,160.00 | |
| | APPLIANCES | $ 56,000.00 | |
| | TRIM PACKAGE | $ 49,280.00 | |
| | INTERIOR PAINT | $ 35,200.00 | |
| | MISCELLANEOUS | $ 26,400.00 | |
| | MASONRY/ROCK WORK | $ 44,000.00 | |
| Subtotal: | | **$ 717,799.40** | |
| | **BUILDING ( E) 10 UNITS** | | **Building E:** This building has been roofed, |
| | PLUMBING | $ 80,300.00 | framed and windows installed. Plumbing and |
| | ELECTRIC | $ 37,180.00 | electrical rouhging has been also been |
| | HVAC | $ 76,494.00 | completed. Needs insulation and framing |
| | INSULATION | $ 12,520.00 | inspection to get to the next stage for drywall |
| | DRYWALL | $ 65,000.00 | and finishing. Work can be completed in 6-8 |
| | TRIM WORK | $ 16,500.00 | months subject to City of Atlanta inspection |
| | TRIM PACKAGE | $ 30,800.00 | schedule.Please note that this buidding has 10 |
| | INTERIOR PAINT | $ 22,000.00 | units. |
| | APPLIANCES | $ 35,000.00 | **To be done by July 2021** |
| | TILE BATHROOM | $ 13,200.00 | |
| | KITCHEN CABINET | $ 26,400.00 | |
| | COUNTER TOPS | $ 4,950.00 | |
| | FLOORING | $ 44,044.00 | |
| | MISCELLANEOUS | $ 16,500.00 | |
| | MASONRY/ROCK WORK | $ 27,500.00 | |
| Subtotal: | | **$ 508,388.00** | |
| | **BUILDING (F) 10 UNITS** | | **Building F:** Building E: This building has been |
| | PLUMBING | $ 80,300.00 | roofed, framed and windows installed. Plumbing |
| | ELECTRIC | $ 59,520.00 | and electrical roughing has also been |
| | HVAC | $ 76,494.00 | completed. Needs insulation and framing |
| | INSULATION | $ 12,520.00 | inspection to get to the next stage for drywall |
| | DRYWALL | $ 65,000.00 | and finishing. Work can be completed in 6-8 |
| | TRIM WORK | $ 16,500.00 | months subject to inspection City of Atlanta |
| | TRIM PACKAGE | $ 30,800.00 | inspection schedule.Please note that it has 10 |
| | INTERIOR PAINT | $ 22,000.00 | units. |
| | APPLIANCES | $ 35,000.00 | **To be done by September 2021** |
| | TILE BATHROOM | $ 13,200.00 | |
| | KITCHEN CABINETS | $ 26,400.00 | |
| | COUNTER TOPS | $ 4,950.00 | |
| | FLOORING | $ 44,044.00 | |
| | MISCELLANEOUS | $ 16,500.00 | |
| | MASONARY/ROCK WORK | $ 27,500.00 | |
| Subtotal: | | **$ 530,728.00** | |
| Total: | | $ 1,756,915.40 | |
| | TOTAL REPAIR | $ 1,756,915.40 | |
| | **GENERAL CONTRACTOR FEES** | $ 175,691.54 | |
| | **TOTAL PLUS MANAGEMENT FEE** | $ 1,932,606.94 | |

Alvarez Investement Group LLC - ▇▇▇▇

# EXHIBIT A

Borrower Intials

Deed Book 62744 Page 478
Filed and Recorded 12/7/2020 4:45:00 PM
2020-0360909
Cathelene Robinson
Clerk of Superior Court
Fulton County, GA
Participant IDs: 2869972434

After recording return to:
NuBridge Commercial Lending LLC
21680 Gateway Center Drive, # 230
Diamond Bar, CA 91765
Attn:   General Counsel.

PARCEL ID:14F-0015-0004-032-7 & 14F-0015-0004-047-5

### DEED TO SECURE DEBT,
### ASSIGNMENT OF LEASES AND RENTS,
### SECURITY AGREEMENT AND FIXTURE FILING

#### (GEORGIA)

Pursuant to [O.C.G.A. Section ___560-11-8___ OR Georgia Department of Revenue Regulation
_____ (as applicable)], no Georgia Intangible Recording Tax is due at the time
of recording of this instrument because _____ loan  less  than  3 years

Security Instrument – Georgia (2016)                    Page 1 of 23
Alvarez Investement Group LLC                           Loan # ▮▮▮▮

**EXHIBIT B**



After recording return to:
NuBridge Commercial Lending LLC
21680 Gateway Center Drive, # 230
Diamond Bar, CA 91765
Attn:   General Counsel.

**DEED TO SECURE DEBT,
ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

**(GEORGIA)**

Pursuant to [O.C.G.A. Section ~~560-11-8~~  OR Georgia Department of Revenue Regulation
_____ (as applicable)], no Georgia Intangible Recording Tax is due at the time
of recording of this instrument because _____ loan less than 3 years

EXHIBIT B



### DEED TO SECURE DEBT,
### ASSIGNMENT OF LEASES AND RENTS,
### SECURITY AGREEMENT AND FIXTURE FILING

This DEED TO SECURE DEBT, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**") dated as of **December 2, 2020**, is executed by **Alvarez Investement Group LLC**, a **Georgia Limited Liability Company**, as grantor ("**Borrower**"), to and for the benefit of NuBridge Commercial Lending LLC, a limited liability company organized and existing under the laws of the State of Delaware, as grantee ("**Lender**").

Borrower, in consideration of (i) the loan in the original principal amount of **nine million six hundred thirty-seven thousand five hundred and 00/100** Dollars (**$9,637,500.00**) (the "**Mortgage Loan**") evidenced by that certain Promissory Note dated as of the date of this Security Instrument, executed by Borrower and made payable to the order of Lender maturing on **December 1, 2021** (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), (ii) that certain Loan and Security Agreement dated as of the date of this Security Instrument, executed by and between Borrower and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and (iii) the security title created and transferred to Lender by this Security Instrument, and to secure to Lender the repayment of the Indebtedness (as defined in this Security Instrument), and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined in the Loan Agreement), excluding the Environmental Indemnity Agreement (as defined in this Security Instrument), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, irrevocably and unconditionally grants, warrants, conveys, bargains, sells, and assigns to and for the benefit of Lender, with power of sale and right of entry and possession, the Mortgaged Property (as defined in this Security Instrument), including the real property located in **Fulton** County, State of Georgia, and described in <u>Exhibit A</u> attached to this Security Instrument and incorporated herein by reference (the "**Land**"), to have and to hold such Mortgaged Property unto Lender and Lender's successors and assigns, forever; Borrower hereby releasing, relinquishing and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction (as defined in this Security Instrument), if applicable.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, warrant, convey, bargain, sell, and assign the Mortgaged Property, and that the Mortgaged Property is not encumbered by any Lien (as defined in this Security Instrument) other than Permitted Encumbrances (as defined in this Security Instrument). Borrower covenants that Borrower will warrant and defend the title to the Mortgaged Property against all claims and demands other than Permitted Encumbrances.

Security Instrument – Georgia (2016)                                    Page 2 of 23
Alvarez Investement Group LLC                                          Loan # ▮▮▮▮▮

EXHIBIT B



Borrower and (by its acceptance hereof) Lender covenants and agrees as follows:

1.    **Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.  All terms used and not specifically defined herein, but which are otherwise defined by the UCC, shall have the meanings assigned to them by the UCC.  The following terms, when used in this Security Instrument, shall have the following meanings:

"**Condemnation Action**" means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect.

"**Enforcement Costs**" means all expenses and costs, including reasonable attorneys' fees and expenses, fees and out-of-pocket expenses of expert witnesses and costs of investigation, incurred by Lender as a result of any Event of Default under the Loan Agreement or in connection with efforts to collect any amount due under the Loan Documents, or to enforce the provisions of the Loan Agreement or any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy or insolvency proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or Foreclosure Event) or judicial or non-judicial foreclosure proceeding, to the extent permitted by law.

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the date of this Security Instrument, executed by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Event of Default**" has the meaning set forth in the Loan Agreement.

"**Fixtures**" means all Goods that are so attached or affixed to the Land or the Improvements as to constitute a fixture under the laws of the Property Jurisdiction.

"**Goods**" means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens,

EXHIBIT B



refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"**Imposition Deposits**" means deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the Impositions when due.

"**Impositions**" means

    (a)    any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property;

    (b)    the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement;

    (c)    Taxes; and

    (d)    amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under the Note, the Loan Agreement, this Security Instrument or any other Loan Document (other than the Environmental Indemnity Agreement and Guaranty), including Prepayment Premiums, late charges, interest charged at the Default Rate, and accrued interest as provided in the Loan Agreement and this Security Instrument, advances, costs and expenses to perform the obligations of Borrower or to protect the Mortgaged Property or the security of this Security Instrument, all other monetary obligations of Borrower under the Loan Documents (other than the Environmental Indemnity Agreement), including amounts due as a result of any indemnification obligations, and any Enforcement Costs.

"**Land**" means the real property described in <u>Exhibit A</u>.

EXHIBIT B



"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof.

"**Lien**" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a Governmental Authority, including any lien in connection with the payment of utilities, or any other encumbrance.

"**Mortgaged Property**" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

    (a)    the Land;

    (b)    the Improvements;

    (c)    the Personalty;

    (d)    current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

    (e)    insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

    (f)    awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

    (g)    contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

**Security Instrument – Georgia (2016)**
**Alvarez Investement Group LLC**

Page 5 of 23
Loan # ███████

EXHIBIT B



(h)    Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)    earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)    Imposition Deposits;

(k)    refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(l)    tenant security deposits;

(m)    names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)    Collateral Accounts and all Collateral Account Funds;

(o)    products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(p)    all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

"**Permitted Encumbrance**" means only the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the Title Policy and Taxes for the current tax year that are not yet due and payable.

"**Personalty**" means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of,

EXHIBIT B



or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"**Prepayment Premium**" has the meaning set forth in the Loan Agreement.

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

"**Software**" means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include any computer program that is included in the definition of Goods.

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Document.

"**Title Policy**" has the meaning set forth in the Loan Agreement.

"**UCC**" means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

"**UCC Collateral**" means any or all of that portion of the Mortgaged Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.    **Security Agreement; Fixture Filing.**

(a)    To secure to Lender, the repayment of the Indebtedness, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Mortgaged Property that is or may become a Fixture under applicable law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender

EXHIBIT B



may require to perfect or continue the perfection of this security interest without the signature of Borrower. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. The name and address of the debtor and secured party are set forth after Borrower's signature below which are the addresses from which information on the security interest may be obtained.

(b)    Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office within five (5) days of such change; (2) Borrower is the record owner of the Mortgaged Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 2 of this Security Instrument; (4) Borrower's exact legal name is as set forth on Page 2 of this Security Instrument; (5) Borrower's organizational identification number, if applicable, is as set forth after Borrower's signature below; (6) Borrower is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) except as expressly provided in the Loan Agreement, the UCC Collateral will not be removed from the Mortgaged Property without the consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

(c)    All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the lien and security interest created by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

3.    **Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Leases and Rents. It is the intention of Borrower to establish present, absolute and irrevocable transfers and assignments to Lender of all Leases and Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Borrower and Lender intend the assignments of Leases and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only. Only for purposes of giving effect to these absolute assignments of Leases and Rents, and for no other purpose, the Leases and Rents

**EXHIBIT B**

shall not be deemed to be a part of the Mortgaged Property. However, if these present, absolute and unconditional assignments of Leases and Rents are not enforceable by their terms under the laws of the Property Jurisdiction, then each of the Leases and Rents shall be included as part of the Mortgaged Property, and it is the intention of Borrower, in such circumstance, that this Security Instrument create and perfect a lien on each of the Leases and Rents in favor of Lender, which liens shall be effective as of the date of this Security Instrument.

(b)    Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Documents, Borrower shall have a revocable license to exercise all rights, power and authority granted to Borrower under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities and Impositions (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

(c)    If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall automatically terminate, and Lender shall immediately have all rights, powers and authority granted to Borrower under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid. During the continuance of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources, pay the total amount of such receipts to Lender. Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts that are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

EXHIBIT B

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower, and even in the absence of waste, enter upon, take and maintain full control of the Mortgaged Property, and may exclude Borrower and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing this assignment of Rents, protecting the Mortgaged Property or the security of this Security Instrument and the Mortgage Loan, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(e)    Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Borrower's solvency, and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in Section 3. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law. Borrower consents to shortened time consideration of a motion to appoint a receiver. Lender or the receiver, as applicable, shall be entitled to receive a reasonable fee for managing the Mortgaged Property and such fee shall become an additional part of the Indebtedness. Immediately upon appointment of a receiver or Lender's entry upon and taking possession and control of the Mortgaged Property, possession of the Mortgaged Property and all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the receiver, as applicable. If Lender or receiver takes possession and control of the Mortgaged Property, Lender or receiver may exclude Borrower and its representatives from the Mortgaged Property.

(f)    The acceptance by Lender of the assignments of the Leases and Rents pursuant to this Section 3 shall not at any time or in any event obligate Lender to take any action under any Loan Document or to expend any money or to incur any expense. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Mortgaged Property. Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

        (1)    obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

**EXHIBIT B**



(2)    obligated to appear in or defend any action or proceeding relating to any Lease or the Mortgaged Property; or

(3)    responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

(g)    Lender shall be liable to account only to Borrower and only for Rents actually received by Lender. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order. If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Indebtedness, be immediately due and payable, and bear interest at the Default Rate from the date of disbursement until fully paid. Any entering upon and taking control of the Mortgaged Property by Lender or the receiver, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Document.

4.    **Protection of Lender's Security.**

If Borrower fails to perform any of its obligations under this Security Instrument or any other Loan Document, or any action or proceeding is commenced that purports to affect the Mortgaged Property, Lender's security, rights or interests under this Security Instrument or any Loan Document (including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Environmental Laws, fraudulent conveyance or reorganizations or proceedings involving a debtor or decedent), Lender may, at its option, make such appearances, disburse or pay such sums and take such actions, whether before or after an Event of Default or whether directly or to any receiver for the Mortgaged Property, as Lender reasonably deems necessary to perform such obligations of Borrower and to protect the Mortgaged Property or Lender's security, rights or interests in the Mortgaged Property or the Mortgage Loan, including:

(a)    paying fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants;

EXHIBIT B



(b)    entering upon the Mortgaged Property to make repairs or secure the Mortgaged Property;

(c)    obtaining (or force-placing) the insurance required by the Loan Documents; and

(d)    paying any amounts required under any of the Loan Documents that Borrower has failed to pay.

Any amounts so disbursed or paid by Lender shall be added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid.  The provisions of this Section 4 shall not be deemed to obligate or require Lender to incur any expense or take any action.

5.    **Default; Acceleration; Remedies.**

(a)    If an Event of Default has occurred and is continuing, Lender, at its option, may declare the Indebtedness to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce payment of the Mortgage Loan; (2) to foreclose this Security Instrument judicially or non-judicially by the power of sale granted herein; (3) to enforce or exercise any right under any Loan Document; and (4) to pursue any one (1)or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable law.  Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.  Borrower has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Borrower to acceleration and sale.

(b)    Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender without prior judicial hearing and hereby appoints Lender as Borrower's agent and attorney-in-fact to exercise such power of sale in the name and on behalf of Borrower.  In the event Lender invokes the power of sale:

(1)    Borrower hereby authorizes and empowers Lender to take possession of the Mortgaged Property, or any part thereof, and hereby grants to Lender a power of sale and authorizes and empowers Lender to sell (or, in the case of the default of any purchaser, to resell) the Mortgaged Property or any part thereof, in compliance with applicable law, including compliance with any and all notice and timing requirements for such sale;

(2)    Lender may sell and dispose of the Mortgaged Property at public auction, at the usual place for conducting sales at the courthouse in the county where all or any part of the Mortgaged Property is located, to the highest bidder for cash, first advertising the time, terms and place of such sale by publishing a notice of sale once a week for four (4)

EXHIBIT B

consecutive weeks (without regard to the actual number of days) in a newspaper in which serves as the official publication of legal notices and advertisements in such county, all other notice being waived by Borrower; and Lender may thereupon execute and deliver to the purchaser a sufficient instrument of conveyance of the Mortgaged Property, which may contain recitals as to the happening of the Event of Default upon which the execution of the power of sale granted by this Section 5 depends. The recitals in the instrument of conveyance shall be presumptive evidence that Lender duly complied with all preliminary acts prerequisite to the sale and instrument of conveyance. Borrower constitutes and appoints Lender as Borrower's agent and attorney-in-fact to make such recitals, sale and conveyance;

(3)     the power and agency granted in this Section 5 are coupled with an interest, are irrevocable by death or otherwise, and are in addition to the remedies for collection of the Indebtedness as provided by law. Borrower ratifies all of Lender's acts, as such attorney-in-fact, and Borrower agrees that such recitals shall be binding and conclusive upon Borrower and that the conveyance to be made by Lender (and in the event of a deed in lieu of foreclosure, then as to such conveyance) shall be effectual to bar all right, title and interest, equity of redemption, including all statutory redemption, homestead, dower, curtsey, and all other exemptions of Borrower, or its successors in interest, in and to the Mortgaged Property; and

(4)     the Mortgaged Property may be sold in one (1) parcel and as an entirety, or in such parcels, manner or order as Lender, in its discretion, may elect, and one (1) or more exercises of the powers granted in this Section 5 shall not extinguish or exhaust the power unless the entire Mortgaged Property is sold or the Indebtedness is paid in full, and Lender shall collect the proceeds of such sale, applying such proceeds as provided in this Section 5. In the event of a deficiency, Borrower shall immediately on demand from Lender pay such deficiency to Lender, subject to the provisions of the Note limiting Borrower's personal liability for payment of the Indebtedness. Borrower waives all rights, claims, and defenses with respect to Lender's ability to obtain a deficiency judgment. Borrower acknowledges that Lender may bid for and purchase the Mortgaged Property at any foreclosure sale and shall be entitled to apply all or any part of the Indebtedness as a credit to the purchase price.

(c)     If the Mortgaged Property is sold pursuant to this Section 5, Borrower, or any person holding possession of the Mortgaged Property through Borrower, shall surrender possession of the Mortgaged Property to the purchaser at such sale on demand. If possession is not surrendered on demand, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Georgia law.

(d)     Borrower covenants and agrees that Lender shall apply the proceeds of any sale in the following order:

(1)     to all reasonable costs and expenses of the sale, including reasonable attorneys' fees and costs associated with title evidence and the reasonable cost of such

EXHIBIT B



other professionals who provided services in connection with the sale or establishing a deficiency, if any;

(2)     to the Indebtedness in such order as Lender, in Lender's discretion, directs; and

(3)     the excess, if any, to the person or persons legally entitled to the excess.

(e)     In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Document, there shall be allowed and included as Indebtedness: (1) all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs; (2) all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Documents; and (3) costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value of the Mortgaged Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Documents. All expenditures and expenses of the nature mentioned in this Section 5 and such other expenses and fees as may be incurred in the protection of the Mortgaged Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Note, the other Loan Documents, or the Mortgaged Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Indebtedness and shall be immediately due and payable by Borrower, with interest thereon at the Default Rate until paid.

(f)     Any action taken by Lender pursuant to the provisions of this Section 5 shall comply with the laws of the Property Jurisdiction. Such applicable laws shall take precedence over the provisions of this Section 5, but shall not invalidate or render unenforceable any other provision of any Loan Document that can be construed in a manner consistent with any applicable law. If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession) or a receiver appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall

EXHIBIT B

be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law.

### 6.    Waiver of Statute of Limitations and Marshaling.

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document. Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Document or by applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower, for itself and all who may claim by, through, or under it, and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Document, or afforded by applicable law.

### 7.    Waiver of Redemption; Rights of Tenants.

(a)    Subject, in any event, to Section 11(c) hereof, Borrower hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

(1)    Borrower for itself and all Persons who may claim by, through, or under Borrower, hereby expressly waives any so-called "Moratorium Law" and any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws," and all rights of reinstatement and redemption of Borrower and of all other Persons claiming by, through, or under Borrower are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law;

(2)    Borrower shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(3)    if Borrower is a trust, Borrower represents that the provisions of this Section 7 (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction

**EXHIBIT B**



over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

(b)    Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Mortgaged Property having an interest in the Mortgaged Property prior to that of Lender. The failure to join any such tenant or tenants of the Mortgaged Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Mortgaged Property, any statute or rule of law at any time existing to the contrary notwithstanding.

8.    **Notice.**

(a)    All notices under this Security Instrument shall be:

(1)    in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)    addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)    deemed given on the earlier to occur of:

(A)    the date when the notice is received by the addressee; or

(B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)    Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

(c)    Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

9.    **Mortgagee-in-Possession.**

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.



EXHIBIT B

**10.     Release and Reconveyance.**

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and the reconveyance of the Mortgaged Property to Borrower, and Borrower shall pay Lender's costs incurred in connection with such release and reconveyance.

**11.     Georgia State Specific Provisions.**

(a)     To the fullest extent permitted by law, Borrower agrees that Borrower will not at any time insist upon, plead, claim or take the benefit or advantage of any present or future law providing for any appraisement, valuation, stay, extension or redemption, homestead, moratorium, reinstatement, marshaling or forbearance, and Borrower, for Borrower, Borrower's heirs, devisees, representatives, successors and assigns, and for any and all persons ever claiming any interest in the Mortgaged Property, to the fullest extent permitted by law, waives and releases all rights of redemption, valuation, appraisement, stay of execution, reinstatement (including all rights under O.C.G.A. Section 44-14-85), notice of intention to mature or declare due the whole of the Indebtedness, and all rights to a marshaling of assets of Borrower, including the Mortgaged Property.

(b)     This Security Instrument secures future advances.

(c)     This conveyance is intended to and shall constitute and be construed as (1) a deed passing fee title to the Mortgaged Property to Lender, and is made under those provisions of the existing laws of the State of Georgia (O.C.G.A. Section 44-14-60 *et seq.*) relating to conveyances and deeds to secure debt (a/k/a "security deed"), and not a mortgage, and is given to secure the payment and performance of the Indebtedness, and (2) a security agreement pursuant to the provisions of the Uniform Commercial Code of Georgia, Title 11 of the Official Code of Georgia. Moreover, use of the terms "Mortgaged Property" or "Mortgage Loan," whether in this Security Instrument or in any other Loan Document, shall not be construed to mean that this Security Instrument is a mortgage.

(d)     Lender's acceptance, if any, of an assumption of the obligations of this Security Instrument and the Note, and the release of Borrower pursuant to the Loan Agreement, shall not constitute a novation and shall not affect the priority of the lien created by this Security Instrument.

(e)     The interest of Lender under this Security Instrument and the liability and obligation of Borrower for the Indebtedness arise from a "commercial transaction" within the meaning of O.C.G.A. Section 44-14-260(1). Accordingly, pursuant to O.C.G.A. Section 44-14-263, Borrower waives any and all rights which Borrower may have to notice (other than as may be expressly provided for herein) prior to seizure by Lender of any interest in personal property of Borrower which constitutes part of the Mortgaged Property, whether such seizure is by writ of possession or otherwise.

Security Instrument – Georgia (2016)                                            Page 17 of 23
Alvarez Investement Group LLC                                                  Loan # ▮▮▮▮▮



EXHIBIT B

(f)     In all events where Borrower may be obligated to pay all reasonable costs, expenses and attorneys' fees incurred by Lender in connection with the Loan Documents, "reasonable attorneys' fees" or words of similar import shall in all events mean reasonable attorneys' fees, actually incurred, without the application of the statutory presumption established by the O.C.G.A. Section 13-1-11.

(g)     Pursuant to O.C.G.A. Section 44-14-80, the parties to this Security Instrument intend to establish and do hereby establish a perpetual or indefinite security interest in the Mortgaged Property.

(h)     Wherever the word "lien" is used with respect to the encumbrance effected by this Security Instrument, such as in the phrase "the lien of this Security Instrument," or words of similar import, such word shall mean and be a reference to the "lien and security title" of this Security Instrument.

## 12.     Governing Law; Consent to Jurisdiction and Venue.

This Security Instrument shall be governed by the laws of the Property Jurisdiction without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction.  Borrower agrees that any controversy arising under or in relation to this Security Instrument shall be litigated exclusively in the Property Jurisdiction.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 13.     Miscellaneous Provisions.

(a)     This Security Instrument shall bind, and the rights granted by this Security Instrument shall benefit, the successors and assigns of Lender.  This Security Instrument shall bind, and the obligations granted by this Security Instrument shall inure to, any permitted successors and assigns of Borrower under the Loan Agreement.  If more than one (1) person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several.  The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower.  No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Document.

(b)     The invalidity or unenforceability of any provision of this Security Instrument or any other Loan Document shall not affect the validity or enforceability of any other provision of this Security Instrument or of any other Loan Document, all of which shall remain in full force and effect.  This Security Instrument contains the complete and entire agreement among the parties



EXHIBIT B

as to the matters covered, rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by written agreement signed by the parties hereto.

(c)      The following rules of construction shall apply to this Security Instrument:

(1)      The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.

(2)      Any reference in this Security Instrument to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Security Instrument or to a Section or Article of this Security Instrument.

(3)      Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(4)      Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular.

(5)      As used in this Security Instrument, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(6)      Whenever Borrower's knowledge is implicated in this Security Instrument or the phrase "to Borrower's knowledge" or a similar phrase is used in this Security Instrument, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(7)      Unless otherwise provided in this Security Instrument, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(8)      All references in this Security Instrument to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(9)      "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

Security Instrument – Georgia (2016)                                                     Page 19 of 23
Alvarez Investement Group LLC                                                            Loan # ███████

EXHIBIT B

14.    **Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument and the other Loan Documents, time is of the essence.

15.    **WAIVER OF TRIAL BY JURY.**

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.    THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**ATTACHED EXHIBITS.**    The following Exhibits are attached to this Security Instrument and incorporated fully herein by reference:

|X|            Exhibit A            Description of the Land (required)

**[Remainder of Page Intentionally Blank]**

Security Instrument – Georgia (2016)                    Page 20 of 23
Alvarez Investement Group LLC                            Loan # ███

EXHIBIT B

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument under seal (where applicable) or has caused this Security Instrument to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides, Borrower intends that this Security Instrument shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER**:
**Alvarez Investement Group LLC**

Signed, sealed and delivered in the presence of:

By: _____
Name: Joanna A. Burnley
Title: CEO & Sole Member

_____
Unofficial Witness:

_____
Notary Public

The name, chief executive office and organizational identification number of Borrower (as Debtor under any applicable Uniform Commercial Code) are:
Debtor Name/Record Owner: **Alvarez Investement Group LLC**
Debtor Chief Executive Office Address:
640 Pine Ridge Trail SE
Conyers, GA 30094
_____

The name and chief executive office of Lender (as Secured Party) are:
Secured Party Name: NuBridge Commercial Lending LLC
Secured Party Chief Executive Office Address:
21680 Gateway Center Drive, #230
Diamond Bar, CA 91765

**Security Instrument – Georgia (2016)**
**Alvarez Investement Group LLC**

**Page 21 of 23**
**Loan #** ████

EXHIBIT B



State of Georgia

County of _Cobb_

This instrument was acknowledged before me this _2_ day of _December_ (month), _2020_ (year),
by _Leonard Medley_ (name of officer or agent, title or officer or agent) of _Medley &_ (name of entity
acknowledging) a _____ (state or place of incorporation) limited liability company, on behalf of the
limited liability company.

_____ Personally Known

__X__ Produced Identification

Type and # of ID _D.L. 054056114_

(Seal)

_(Signature Notary)_

_T. Miller_

Name of Notary Typed, Stamped or Printed)
Notary Public, State of Georgia

**Security Instrument – Georgia (2016)**
**Alvarez Investement Group LLC**

Page 22 of 23
Loan # ███████

# EXHIBIT B

## EXHIBIT A

ALL THAT TRACT OR PARCEL OF LAND LYING IN AND BEING IN LAND LOT 15, DISTRICT 14FF, CITY OF ATLANTA, FULTON COUNTY, GEORGIA; AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE CONCRETE MONUMENT MARKING THE INTERSECTION OF THE NORTHEASTERLY RIGHT OF WAY OF MARTIN LUTHER KING JR. DRIVE {90' R/W) AND THE NORTHERLY RIGHT OF WAY OF BOLTON ROAD (R/W VARIES), WHICH IS THE POINT OF BEGINNING;

THENCE TRAVELING ALONG THE NORTHEASTERLY RIGHT OF WAY OF MARTIN LUTHER KING JR. DRIVE NORTH 32 DEGREES 11 MINUTES 47 SECONDS WEST A DISTANCE OF 164.45 FEET TO A CONCRETE MONUMENT FOUND; THENCE CONTINUING ALONG SAID RIGHT OF WAY ALONG A CURVE TO THE RIGHT WITH AN ARC DISTANCE OF 3.84 FEET AND A RADIUS OF 3100.77 FEET, BEING SUBTENDED BY A CHORD OF NORTH 32 DEGREES 13 MINUTES 47 SECONDS A DISTANCE OF 3.84 FEET TO A 1/2" REBAR FOUND; THENCE LEAVING SAID RIGHT OF WAY NORTH 81 DEGREES 31 MINUTES 33 SECONDS EAST A DISTANCE OF 271.50 FEET TO AN OPEN-TOP PIPE FOUND; THENCE RUNNING NORTH 01 DEGREES 11 MINUTES 37 SECONDS EAST A DISTANCE OF 356.89 FEET TO A 1/2" REBAR FOUND; THENCE SOUTH 88 DEGREES 32 MINUTES 24 SECONDS WEST A DISTANCE OF 269.20 FEET TO A 1/2" REBAR FOUND; THENCE NORTH 01 DEGREES 28 MINUTES 00 SECONDS WEST A DISTANCE OF 172.06 FEET TO A POINT; THENCE SOUTH 89 DEGREES 41 MINUTES 00 SECONDS EAST A DISTANCE OF 82.38 FEET TO AN OPEN-TOP PIPE FOUND; THENCE SOUTH 30 DEGREES 55 MINUTES 41 SECONDS EAST A DISTANCE OF 70.63 FEET TO AN OPEN-TOP PIPE FOUND; THENCE SOUTH 89 DEGREES 13 MINUTES 51 SECONDS EAST A DISTANCE OF 340.84 FEET TO A POINT; THENCE SOUTH 07 DEGREES 47 MINUTES 17 SECONDS WEST A DISTANCE OF 45.93 FEET TO A POINT; THENCE SOUTH 06 DEGREES 49 MINUTES 25 SECONDS WEST A DISTANCE OF 147.88 FEET TO A CRIMPED-TOP PIPE FOUND; THENCE SOUTH 76 DEGREES 16 MINUTES 56 SECONDS EAST A DISTANCE OF 268.81 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY OF BOLTON ROAD; THENCE RUNNING ALONG THE WESTERLY AND NORTHERLY RIGHT OF WAY OF BOLTON ROAD THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE ALONG A CURVE TO THE RIGHT WITH AN ARC DISTANCE OF 217.74 FEET AND A RADIUS OF 762.00 FEET, BEING SUBTENDED BY A CHORD OF SOUTH 18 DEGREES 30 MINUTES 49 SECONDS WEST A DISTANCE OF 217.00 FEET TO A POINT; THENCE SOUTH 25 DEGREES 58 MINUTES 47 SECONDS WEST A DISTANCE OF 82.15 FEET TO A CONCRETE MONUMENT FOUND; THENCE NORTH 62 DEGREES 55 MINUTES 43 SECONDS WEST A DISTANCE OF 29.90 FEET TO A 1/2" REBAR FOUND; THENCE SOUTH 26 DEGREES 52 MINUTES 47 SECONDS WEST A DISTANCE OF 97.40 FEET TO A 1/2" REBAR FOUND; THENCE SOUTH 86 DEGREES 04 MINUTES 30 SECONDS WEST A DISTANCE OF 435.09 FEET TO THE TRUE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND CONTAINS 5.818 ACRES AND IS DEPICTED ON THAT CERTAIN ALTA/ACSM PLAT OF SURVEY PREPARED BY LANDPRO SURVEYING AND MAPPING, INC., SEALED AND CERTIFIED BY JAMES H. RADER, GRLS NO. 3033, DATED NOVEMBER 20, 2014.

For Informational Purposes Only: 3751 Martin Luther King Jr. Dr. SW, Atlanta, GA 30331

# EXHIBIT B



# ...yment Receipt

CATHELENE ROBINSON
Clerk of Superior Court
Fulton County
136 Pryor Street

County Superior Courts
St. SW
A 30303
5360

PLEASE RETAIN THIS RECEIPT, THANK YOU

| N | Inst | Bk & Page | Amount |
|---|------|-----------|--------|
| 47233 | QCD | DE-65493-12 | $29.00 |

Date Filed: Apr-04-2022 at 12:08pm

gister/Trans: VOL  20220404-350
esented By: ALVAREZ

| | | |
|---|---|---|
| ING | | $25.00 |
| ER TAX | | $0.00 |
| S | | $4.00 |
| | | ============== |
| FEES DUE | | $29.00 |

nt for Recording Fees:     $29.00
Credit# 209416081652      ==============
                                    $29.00
AMOUNT TENDERED            $0.00
CE DUE

**OFFICIAL RECEIPT**
Printed April-04-2022 at 12:08 PM

agree to the following Terms and Conditions with this Payment:

l be Five Point Payments, LLC. All payments are final. NO refunds are available or allowed. The
ate transaction on my card statement.

ee that this is a payment for a criminal fine or other charge that can in no way be disputed.
d. Should this charge be disputed by you without authority, you acknowledge and agree that you
penalties, including but not limited to, jail time and fines up to $500 per instance, for civil
ice fees, plus costs, plus attorney fees, plus any incidental or associated damages.

████ 1652

4/4/2022
74.174.59.6
QCD
**Alvarez Investment Group llc**

| CARDHOLDER INFORMATION: | |
|---|---|
| Name: | donald/a jacobs |
| Card Number: | ****.****.****.4287 |
| Zip Code: | 30305 |
| Zip Code Verification: | Verified Match |
| Street Address Verification: | Verified Match |
| CVV Code Verification: | Verified Match |

| TRANSACTION BREAKDOWN: | |
|---|---|
| Payment Amount: | $29.00 |
| Service Fee: | $0.00 |
| Total Payment: | $29.00 |

Customer Signature

For support regarding payments
Email mailto:support@fivepointpayments.com


FIVEPOINT

# EXHIBIT C

Deed Book 65493 Pg 12
Filed and Recorded Apr-04-2022 12:08pm
2022-0147233
Real Estate Transfer Tax $0.00
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

Prepared by:

Alvarez Investement Group LLC

640 Pine Ridge Rd SE, Smyrna, GA 30080, USA

Parcel ID:

14F-0015-0004-032-7 & 14F-0015-0004-047-5

## Quitclaim Deed

STATE OF GEORGIA

COUNTY OF Fulton

THIS INDENTURE, made the April 1, 2022, between  Alvarez Investement Group LLC, a Georgia corporation whose tax mailing address is 640 Pine Ridge Rd SE, Smyrna, GA 30080, USA, (the "Grantor"), and Alvarez Investement Group llc, a Georgia corporation, whose tax mailing address is 640 Pine Ridge Trail SE, Conyers, GA 30094, USA, and Standing Ovation renovation llc, a Georgia corporation,  (collectively the "Grantee") (The words "Grantor" and "Grantee" include their respective heirs, successors, and assigns where the context requires or permits).

WITNESSETH that: The Grantor, for and in consideration of the sum of $1.00 and other valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt of which is hereby acknowledged, by these presents does hereby remise, and convey, as well as quitclaim, unto the said Grantee, the below described tract or parcel of land more fully and completely described as follows:

    See Exhibit "A"

Being the same property conveyed to the Grantor by the deed of Edgar Nelson INC, dated December 7, 2020, previously referenced as follows: Book/Volume 62744, Page 476 of the Recorder of Fulton County.

TO HAVE AND TO HOLD the said described premises to the Grantee, so that neither Grantor nor any person or persons claiming under Grantor shall at any time, by any means or ways, have, claim or demand any right or title to said premises or appurtenances, or any rights thereof.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year above written.

Signed in the presence of:

# EXHIBIT D



1/4

Nm: ALVAREZ INVESTEMENT GROUP  DocCpy-I CFN DE2020-0360908  ORB DE BK62744-PG0476  Pgs 1-2  Instr:WD Page : 2 of 2

Deed Book 62744 Page 477
Cathelene Robinson
Clerk of Superior Court

Exhibit "A"

Legal Description

ALL THAT TRACT OR PARCEL OF LAND LYING IN AND BEING IN LAND LOT 15, DISTRICT 14FF, CITY OF ATLANTA, FULTON COUNTY, GEORGIA; AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE CONCRETE MONUMENT MARKING THE INTERSECTION OF THE NORTHEASTERLY RIGHT OF WAY OF MARTIN LUTHER KING JR. DRIVE (90' R/W) AND THE NORTHERLY RIGHT OF WAY OF BOLTON ROAD (R/W VARIES), WHICH IS THE POINT OF BEGINNING;

THENCE TRAVELING ALONG THE NORTHEASTERLY RIGHT OF WAY OF MARTIN LUTHER KING JR. DRIVE NORTH 32 DEGREES 11 MINUTES 47 SECONDS WEST A DISTANCE OF 164.45 FEET TO A CONCRETE MONUMENT FOUND; THENCE CONTINUING ALONG SAID RIGHT OF WAY ALONG A CURVE TO THE RIGHT WITH AN ARC DISTANCE OF 3.84 FEET AND A RADIUS OF 3100.77 FEET, BEING SUBTENDED BY A CHORD OF NORTH 32 DEGREES 13 MINUTES 47 SECONDS A DISTANCE OF 3.84 FEET TO A 1/2" REBAR FOUND; THENCE LEAVING SAID RIGHT OF WAY NORTH 81 DEGREES 31 MINUTES 33 SECONDS EAST A DISTANCE OF 271.50 FEET TO AN OPEN-TOP PIPE FOUND; THENCE RUNNING NORTH 01 DEGREES 11 MINUTES 37 SECONDS EAST A DISTANCE OF 356.89 FEET TO A 1/2" REBAR FOUND; THENCE SOUTH 88 DEGREES 32 MINUTES 24 SECONDS WEST A DISTANCE OF 269.20 FEET TO A 1/2" REBAR FOUND; THENCE NORTH 01 DEGREES 28 MINUTES 00 SECONDS WEST A DISTANCE OF 172.06 FEET TO A POINT; THENCE SOUTH 89 DEGREES 41 MINUTES 00 SECONDS EAST A DISTANCE OF 82.38 FEET TO AN OPEN-TOP PIPE FOUND; THENCE SOUTH 30 DEGREES 55 MINUTES 41 SECONDS EAST A DISTANCE OF 70.63 FEET TO AN OPEN-TOP PIPE FOUND; THENCE SOUTH 89 DEGREES 13 MINUTES 51 SECONDS EAST A DISTANCE OF 340.84 FEET TO A POINT; THENCE SOUTH 07 DEGREES 47 MINUTES 17 SECONDS WEST A DISTANCE OF 45.93 FEET TO A POINT; THENCE SOUTH 06 DEGREES 49 MINUTES 25 SECONDS WEST A DISTANCE OF 147.88 FEET TO A CRIMPED-TOP PIPE FOUND; THENCE SOUTH 76 DEGREES 16 MINUTES 56 SECONDS EAST A DISTANCE OF 268.81 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY OF BOLTON ROAD; THENCE RUNNING ALONG THE WESTERLY AND NORTHERLY RIGHT OF WAY OF BOLTON ROAD THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE ALONG A CURVE TO THE RIGHT WITH AN ARC DISTANCE OF 217.74 FEET AND A RADIUS OF 762.00 FEET, BEING SUBTENDED BY A CHORD OF SOUTH 18 DEGREES 30 MINUTES 49 SECONDS WEST A DISTANCE OF 217.00 FEET TO A POINT; THENCE SOUTH 25 DEGREES 58 MINUTES 47 SECONDS WEST A DISTANCE OF 82.15 FEET TO A CONCRETE MONUMENT FOUND; THENCE NORTH 62 DEGREES 55 MINUTES 43 SECONDS WEST A DISTANCE OF 29.90 FEET TO A 1/2" REBAR FOUND; THENCE SOUTH 26 DEGREES 52 MINUTES 47 SECONDS WEST A DISTANCE OF 97.40 FEET TO A 1/2" REBAR FOUND; THENCE SOUTH 86 DEGREES 04 MINUTES 30 SECONDS WEST A DISTANCE OF 435.09 FEET TO THE TRUE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND CONTAINS 5.818 ACRES AND IS DEPICTED ON THAT CERTAIN ALTA/ACSM PLAT OF SURVEY PREPARED BY LANDPRO SURVEYING AND MAPPING, INC., SEALED AND CERTIFIED BY JAMES H. RADER, GRLS NO. 3033, DATED NOVEMBER 20, 2014.

Deed Book 65493 Pg 13

# EXHIBIT D

*Quitclaim Deed* _____ Page 2 of 3

_____
Signature

Alvarez Investement Group LLC

Per: _____

_____
Witness Name

Deed Book 65493 Pg 14

# EXHIBIT D

*Quitclaim Deed*                                                                    Page 3 of 3

## Grantor Acknowledgement

STATE OF GEORGIA

COUNTY OF _____Cobb_____

This instrument was acknowledged before me, _____Leon Medly_____ , this 1st day of April
2022, by _____Jorna Bank_____ of Alvarez Investement Group LLC, a Georgia corporation.

_____
Notary Public for the State of Georgia

Seal:

Deed Book 65493 Pg 15
CATHELENE ROBINSON
Clerk of Superior Court
Fulton County, Georgia

# EXHIBIT D

4/4